80 F.3d 688
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Norman WORKMAN, et al., Defendants,
Donald Green, a/k/a Sly, a/k/a Stone; Clyde Thomas Brooks,
a/k/a Luca, a/k/a Luca Brazzi; John Bolden, a/k/a
Johnnie; Derwin Rodgers, Defendants-Appellants,
Jens Jamison a/k/a "Chauncey," Defendant-Appellant-Cross-Appellee.
 Nos. 144, 231, 388, 537,
 Dockets 94-1454, 94-1568, 94-1656 and 95-1016.
United States Court of Appeals,
 Second Circuit.
Argued Sept. 5, 1995.
Decided March 27, 1996.
 
 Terry Granger, Buffalo, N.Y. (Granger & Granger, on the brief), for Defendant-Appellant Donald Green.
 E. Carey Cantwell, Buffalo, N.Y., for Defendant-Appellant Derwin Rodgers.
 David A. Lewis, New York City (Legal Aid Society, Federal Defender Division Appeals Bureau), for Defendant-Appellant-Cross-Appellee Jens Jamison.
 William J. Hochul, Jr., Assistant United States Attorney, Western District of New York, Buffalo, N.Y. (Patrick H. NeMoyer, United States Attorney for the Western District of New York, Buffalo, N.Y., on the brief), for Appellee-Cross-Appellant United States of America.
 Before: FEINBERG, KEARSE, and LEVAL, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 Donald Green, Jens Jamison, and Derwin Rodgers appeal from their convictions after a jury trial before the United States District Court for the Western District of New York (John T. Curtin, Judge ), finding them guilty of various charges relating to their involvement in a sizeable narcotics trafficking enterprise known as the "L.A. Boys."
 
 
 2
 The defendants raise three principal arguments on appeal: (1) that the trial court erred by admitting into evidence tape recordings, made by prison officials acting without court-ordered authorization, of Green's incriminating prison telephone conversations; (2) that the jury instructions were erroneous as to the elements of the charged RICO violation with respect to Jamison and Rodgers, in that they were not in accordance with the requirements of Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); and (3) that Jamison's lawyer rendered ineffective assistance of counsel at sentencing. In turn, the government cross-appeals the trial judge's sentencing decision to grant Jamison a two-level downward departure for rehabilitation. For the reasons stated below, we affirm.
 
 Background
 
 3
 The L.A. Boys was a major narcotics trafficking enterprise that operated in Buffalo, New York. The enterprise was formed in the late 1980s, and continued functioning until approximately July of 1992. In support of the conspiracy's drug-related activities, members committed various acts of violence, including murders, kidnappings, and drive-by shootings.
 
 
 4
 Defendants Green, Jamison, Rodgers, and twenty-two other members of the enterprise were ultimately charged with racketeering, racketeering conspiracy, and narcotics conspiracy. See 18 U.S.C. § 1962(c) & (d); 21 U.S.C. § 846. The indictment also charged Green and Rodgers with illegally using the telephone to facilitate narcotics transactions, see 21 U.S.C. § 843(b), and Green with narcotics distribution and obstruction of justice. See 21 U.S.C. § 841; 18 U.S.C. § 1512(b).[1]
 
 
 5
 The government's evidence at trial showed that Green was the leader of the L.A. Boys, and that he had orchestrated the enterprise's activities. The government presented evidence that he continued to play a significant role in the conspiracy, even though in 1989 he began to serve a murder sentence at the Shawangunk Correctional Facility, a New York state prison. Important evidence at trial came from recordings made by prison officials of a series of incriminating conversations that Green had on the Shawangunk prison telephone.
 
 
 6
 As for Jamison, the government presented evidence that he had purchased and sold narcotics for the organization, providing drugs to street-level dealers for sale on consignment, and later picking up the proceeds. In addition, the evidence showed that he had participated in the December 1989 murder of James Bolden, and the attempted murder of James Wright in August 1989. The government's evidence against Rodgers indicated that he had principally served as a street-level cocaine dealer, and that he had participated in conversations (one held at his home) during which members of the L.A. Boys conspired to murder Darryl "Reese" Johnson, a former leader of the organization.
 
 
 7
 The jury found Rodgers and Jamison guilty on all counts. Green was found guilty on all counts except an obstruction of justice charge. All three defendants appeal.
 
 Discussion
 I. Admission of the Prison Recordings
 
 8
 Prior to trial, defendants moved to suppress recordings made by prison officials of Green's incriminating conversations on the prison telephone. Defendants contended these recordings were made in violation of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-22 ("Title III"), the Fourth Amendment, and the New York State Constitution.
 
 
 9
 At a hearing held before the start of the trial, Lieutenant Tasker--the afternoon Watch Commander at the Shawangunk prison--testified that all of Green's telephone calls were recorded on cassette from the start of his incarceration, and sent to law enforcement officials for use in an ongoing criminal investigation. Between March 1991 and July 1992, prison officials recorded approximately 1,000 separate conversations. The district court denied the motion to suppress, and numerous recordings of Green's prison conversations were received at trial.
 
 A. Title III
 
 10
 Title III generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization. 18 U.S.C. §§ 2510-2522. An unlawfully intercepted telephone call may not be offered as evidence in any trial. See 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication ... may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter.").
 
 
 11
 Title III allows for certain exceptions, however. Among them, the statute provides that "[i]t shall not be unlawful ... for a person acting under color of law to intercept a wire, oral, or electronic communication, where ... one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). Consent may be either express or implied. United States v. Amen, 831 F.2d 373, 378 (2d Cir.1987), cert. denied, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). We have long recognized that, under certain circumstances, prisoners are deemed to have given consent for purposes of Title III to the interception of their calls on institutional telephones. See United States v. Willoughby, 860 F.2d 15, 19-20 (2d Cir.1988), cert. denied, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); Amen, 831 F.2d at 378-79.
 
 
 12
 In Amen, we held that inmates impliedly consent to have their telephone conversations monitored where they have received notice of the surveillance and nevertheless use the prison telephones. 831 F.2d at 378-79. The notice in that case consisted of federal prison regulations clearly indicating that inmate telephone calls were subject to monitoring, an orientation lecture in which the monitoring and taping system was discussed, an informational handbook received by every inmate describing the system, and signs near the telephones notifying inmates of the monitoring. Id. Similarly, we held in Willoughby that a combination of notification at an orientation lecture and signs near the telephones explaining the policy was sufficient to justify the inference of consent by prisoners who used the phones. Willoughby, 860 F.2d at 20.[2]
 
 
 13
 Although Green was given somewhat less notice than the inmates in Willoughby and Amen, he had sufficient warning of the monitoring program that his use of the telephones implied consent to the surveillance. A sign, written in English and Spanish, notifying inmates of the monitoring program was placed near each telephone in the prison. The warning read:
 
 NOTICE
 
 14
 ALL INMATE TELEPHONE CONVERSATIONS ARE SUBJECT TO ELECTRONIC MONITORING BY DEPARTMENTAL PERSONNEL.
 
 
 15
 Approximately one week after arriving at the prison, Green was provided with an orientation handbook. This manual provided further notice of the telephone monitoring program. Green signed a form stating that he had received the handbook. Finally, New York State regulations then in force provided public notice that prisoner "calls are subject to monitoring and may be tape recorded." N.Y.Comp.Codes R. & Regs. tit. 7, at § 723.5(a)(1) (1986) (policy for inmate self-dialed calls); see also id. at § 723.4 (parallel policy for staff-assisted calls). Furthermore, Green's statements on the recordings show that he was successfully informed by the prison's notification program. On many of the tapes, Green warned his interlocutors that the call might be monitored, and he sometimes used coded language in an apparent effort to mislead authorities who might be listening.
 
 
 16
 Green argues that the notice he received was insufficient. In particular, he claims that--unlike the federal prison inmates in Willoughby and Amen--he was told of New York's prison telephone monitoring program, but never expressly informed either that his use of the telephones would constitute consent to the surveillance, or that the monitoring could include recording of his conversations.
 
 
 17
 Green's argument misunderstands the reasoning of Amen and Willoughby. Nothing in those cases turned on whether the prisoner was specifically told that use of the telephones constituted consent. Rather, we inferred consent from circumstances indicating that the prisoner used the telephone with awareness of the possible surveillance. See Amen, 831 F.2d at 378. "The legislative history [of Title III] shows that Congress intended the consent requirement to be construed broadly." Id.; see S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2182. When an inmate has repeatedly received notice that calls placed on prison telephones are subject to surveillance, the evidence indicates that he is in fact aware of the monitoring program, and he nevertheless uses the telephones, by that use he impliedly consents to be monitored for purposes of Title III. See Amen, 831 F.2d at 379 (where "defendants had notice of the interception system ... their use of the telephones ... constituted implied consent to the monitoring").[3]
 
 
 18
 Green points out that neither the sign near the telephone nor the inmate handbook provided to him expressly stated that the monitoring program might include recording. That is of no importance. Recording is simply one way of preserving the information gained from the electronic monitoring. The prison need no more have provided notice that it would record the intercepted conversations than that it might maintain shorthand notes. Moreover, the relevant New York State regulations provided public notice that the state recorded inmate telephone conversations. N.Y.Comp.Codes R. & Regs. tit. 7, §§ 723.4, 723.5(a)(1) (1986).
 
 
 19
 We agree with the district court that the State of New York could and should make greater efforts to ensure that prison inmates have notice of its telephone surveillance policy. However, given Green's plain awareness that his conversations were subject to monitoring at the time he chose to use the prison telephones to conduct his illicit enterprise, we find that he impliedly consented to the surveillance.
 
 B. Federal and State Constitutional Rights
 
 20
 Rodgers claims that his Fourth Amendment rights were violated when prison officials recorded his conversations with Green. We have squarely rejected this argument. As we held in Willoughby, "the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates." Willoughby, 860 F.2d at 22. Only a single participant in a conversation need agree to the monitoring in order to satisfy the requirements of the Fourth Amendment, and Green implicitly gave his consent here. See United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Fourth Amendment does not prohibit use of recorded conversations where one party is complicit in the monitoring); United States v. Barone, 913 F.2d 46, 49 (2d Cir.1990); United States v. Coven, 662 F.2d 162, 173 & n. 8 (2d Cir.1981), cert. denied, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982).
 
 
 21
 Rodgers also argues that the telephone recordings made by state prison officials, even if not in violation of the Fourth Amendment, constituted an abrogation of his rights under parallel provisions of the New York State Constitution, and that this evidence should therefore have been suppressed. See N.Y. Const. art. I, § 12 (guaranteeing "[t]he right of the people to be secure against unreasonable interception of telephone ... communications"). We have no need to determine whether Rodgers has properly construed the State Constitution. Even if he is correct in his interpretation, and we are aware of no authority to this effect, the district court's decision to admit the recordings was nevertheless proper.
 
 
 22
 We confronted a similar question in United States v. Pforzheimer, 826 F.2d 200 (2d Cir.1987). In that case, a defendant argued that the fruits of a search conducted by state officials pursuant to a state court warrant should be suppressed in a federal prosecution where a more stringent state constitutional rule would have required suppression, even though the evidence was admissible as a matter of federal constitutional law. Without passing on the merits of the state constitutional question, we ruled the evidence admissible, holding that where evidence seized by state officers is subsequently offered in a federal criminal proceeding, the seizure need not satisfy state law requirements. Id. at 204; see United States v. Smith, 9 F.3d 1007, 1014 (2d Cir.1993) ("touchstone of a federal court's review of a state search warrant secured by local police officials and employed in a federal prosecution is the Fourth Amendment and its requirements, and no more"); United States v. Rowell, 903 F.2d 899, 901-02 (2d Cir.1990). Cf. United States v. Brown, 52 F.3d 415, 426-27 (2d Cir.1995) (Leval, J., concurring), cert. denied, --- U.S. ----, 116 S.Ct. 754, 133 L.Ed.2d 701 (1996).
 
 
 23
 This case is analogous. Rodgers argues that evidence procured by a state official should be excluded from a federal prosecution if the state official failed to conform to state constitutional standards. There is no such requirement for admissibility of evidence in a federal criminal prosecution. See United States v. Butera, 677 F.2d 1376, 1380 (11th Cir.1982) (tape recordings properly made by state officials pursuant to consent provisions of Title III, 18 U.S.C. § 2511(2)(c), admissible in federal prosecution even where state constitutional law would have required warrant), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); United States v. Nelligan, 573 F.2d 251, 253 (5th Cir.1978) (tape recording of conversation made with consent of one party in compliance with Title III admissible in federal prosecution despite state statute requiring consent of all parties to conversation).[4]
 
 II. Jury Charge on Substantive RICO Offense
 
 24
 Jamison and Rodgers argue that the jury was misinstructed as to the elements of the substantive RICO violation, and that this mistake constitutes reversible error. To show that the defendants were guilty of racketeering in violation of 18 U.S.C. § 1962(c), the government was required to prove that they "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court explained that the defendant must be shown to have had "some part in directing the enterprise's affairs." Id. at 179, 113 S.Ct. at 1170 (emphasis in original). In making this determination, the Court noted that the proper question is whether the defendant had participated in the "operation or management" of the enterprise. Id. at 183, 113 S.Ct. at 1172. While the Court recognized that "[a]n enterprise is 'operated' not just by upper management but also by lower-rung participants ... who are under the direction of upper management," id. at 184, 113 S.Ct. at 1173, Reves expressly declined to reach the question of "how far § 1962(c) extends down the ladder of operation," id. at 184 n. 9, 113 S.Ct. at 1173 n. 9.
 
 
 25
 In this case, the jury was instructed, inter alia, that:
 
 
 26
 The government must prove ... the defendant conducted or participated directly or indirectly in the operation and management of the enterprise. The terms "conduct" and "participate" in the enterprise include the performance of acts or duties that are helpful to the operation of the enterprise. An enterprise is "operated" not just by upper management, but also by lower rung participants in the enterprise who are under the direction of others or persons associated with the enterprise.
 
 
 27
 (emphasis added). Appellants argue that this instruction misstated the proper test under Reves, by suggesting that a minor role in the enterprise--one merely "helpful" to its operation--is sufficient to generate § 1962(c) liability.
 
 A. Standard of Review
 
 28
 Absent a timely objection in the district court, we review a jury charge for plain error only. See United States v. Olano, 507 U.S. 725, 730-32, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993); United States v. Bonito, 57 F.3d 167, 171 (2d Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 713, 133 L.Ed.2d 667 (1996); Fed.R.Crim.P. 30, 52(b).
 
 
 29
 Appellants assert that they did raise a timely objection, but they are incorrect. At a pre-charge conference, defense counsel objected to a different charge proposed by the government. The court did not give the government's proposed charge. It prepared a new text in the light of the discussion at the pre-charge conference. Defense counsel, although provided an opportunity, never objected to the charge as given. See United States v. Civelli, 883 F.2d 191, 194 (2d Cir.) (Fed.R.Crim.P. 30 requires a "distinct and well-grounded objection" in order to "direct the trial court's attention to the contention that is to be raised on appeal"), cert. denied, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). Our inquiry is therefore confined to determining whether the charge constituted plain error.
 
 B. Adequacy of Jury Instructions
 
 30
 The defendants are correct in pointing out that the charge did not conform to the requirement of Reves that the defendant must have had "some part in directing the enterprise's affairs." Reves, 507 U.S. at 179, 113 S.Ct. at 1170 (emphasis in original). In stating that--for purposes of § 1962(c)--"participation" might include "the performance of acts or duties that are helpful to the operation of the enterprise," (emphasis added) the charge may have suggested to the jury that a finding of guilt was appropriate even where the defendant played a quite minimal role. A defendant might well have performed "helpful" acts without playing any part in "directing the enterprise's affairs," Reves, 507 U.S. at 179, 113 S.Ct. at 1170. See United States v. Viola, 35 F.3d 37, 43 (2d Cir.1994) (section 1962(c) does not apply where defendant "was not on the ladder [of operation] at all, but rather, as ... janitor and handyman, was sweeping up the floor underneath it"), cert. denied, --- U.S. ----, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).
 
 
 31
 Furthermore, this suggestion may have been reinforced by the additional instruction that "[a]n enterprise is 'operated' not just by upper management, but also by lower rung participants." Although this language was drawn from the Supreme Court's opinion, it did not conform to the Court's conclusion. See Reves, 507 U.S. at 184 n. 9, 113 S.Ct. at 1173 n. 9 ("[w]e need not decide in this case how far § 1962(c) extends down the ladder of operation").
 
 
 32
 However, as explained above, because the defendants failed to raise an objection to the charge at a time--prior to the jury's deliberation--when the mistake might have been corrected, an error will not be noticed on appeal unless it was "plain error." See Fed.R.Crim.P. 52(b). In United States v. Olano, the Supreme Court set forth a major restatement of the plain error rule. We have summarized this inquiry as follows:
 
 
 33
 Rule 52(b) places three limits on appellate authority to review errors not preserved at trial. First, there must be "error," or deviation from a legal rule which has not been waived. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must, as the text of Rule 52(b) indicates, "affect[ ] substantial rights," which normally requires a showing of prejudice.
 
 
 34
 Viola, 35 F.3d at 41 (citations omitted); see United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir.1995). Furthermore, in United States v. Frady, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court explained that to meet the plainness requirement of Rule 52(b), an error not preserved by timely objection must have been "so 'plain' [that] the trial judge and prosecutor were derelict in countenancing it." Id. at 163, 102 S.Ct. at 1592. Even if all of these requirements are met, we are not obliged to notice on appeal an unpreserved claim of error. Review under "Rule 52(b) is permissive, not mandatory." Olano, 507 U.S. at 735, 113 S.Ct. at 1778. And the Supreme Court has specified that reversals for plain error are appropriate only where failure to do so would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." Id. 507 U.S. at 736, 113 S.Ct. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).
 
 
 35
 Despite the trial court's departure from Reves, we do not find "plain error." At the pre-charge conference, the parties called Reves to the district court's attention, and the judge drafted the charge with that case in mind. Neither the government nor defendants' counsel saw any problem with the charge at the time it was delivered, though they were certainly on notice as to the applicability of Reves and had the opportunity to object. These are not the hallmarks of an error " 'so "plain" [that] the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.' " United States v. Shaoul, 41 F.3d 811, 817 (2d Cir.1994) (quoting Frady, 456 U.S. at 163, 102 S.Ct. at 1592).
 
 
 36
 Even if we were to find this error meets the plainness requirement, the defendants must also demonstrate under the third prong of the Olano analysis that the error was prejudicial. Olano, 507 U.S. at 734, 113 S.Ct. at 1778. In other words, the defendants must show that the error "affected the outcome of the District Court proceedings." Id. (describing inquiry as parallel to "harmless error" analysis save that "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice"). As we noted in Napoli v. United States, 32 F.3d 31 (2d Cir.1994), modified on reh'g, 45 F.3d 680 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 1796, 131 L.Ed.2d 724 (1995), "[u]nder the plain error rule applicable to the review on direct appeal of challenges not raised at trial, ... a jury instruction which omits an element of the offense does not warrant reversal if the element was proven by overwhelming evidence." Id. at 36 (citing United States v. Tillem, 906 F.2d 814, 824-25 (2d Cir.1990)).
 
 
 37
 The evidence as to Jamison's participation in the "operation or management" of the L.A. Boys was overwhelming. The government presented compelling proof that Jamison was an important figure in the enterprise's drug dealing network. Several witnesses testified that Jamison served as an intermediary for lower-level drug dealers, delivering substantial quantities of cocaine for sale on consignment, and picking up the proceeds from the sales. Witnesses also testified that Jamison made trips to Los Angeles for the purpose of picking up drugs for later resale.
 
 
 38
 The government also presented testimony, and the jury found (in its verdict on racketeering acts), that Jamison had participated in the attempted murder of James Wright, a potential witness against one of the L.A. Boys' leaders, and in the murder of James Bolden.
 
 
 39
 In the face of such powerful evidence of Jamison's role in the "operation or management" of the enterprise, the erroneous jury instruction was not prejudicial and did not constitute plain error as to him. This conclusion is similar to our reasoning in United States v. Wong, 40 F.3d 1347, 1374 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995), where we found, inter alia, no plain error as to a similarly deficient Reves charge for three defendants who had planned and carried out several murders in an intensive and continuing conspiracy under the direction of the enterprise's leadership.
 
 
 40
 As for Rodgers, the demonstration of his participation in the operation or management of the enterprise was also sufficiently powerful to meet the test of Napoli and prevent him from demonstrating prejudice. The jury, in its findings on racketeering acts, found Rodgers guilty of participating in a conspiracy to murder "Reese" Johnson, a rival of the L.A. Boys. Three witnesses--all co-defendants--testified that Rodgers was present at a meeting, held at Rodgers' house, at which the murder of Reese was planned. One of the witnesses, Nesbit Lee, testified that the meeting was only to be attended by "captains" in the L.A. Boys organization.[5] Two other witnesses, Norman Workman and Robert Felder, testified that Rodgers volunteered to commit the murder at this meeting. In addition, the government offered a recording of a telephone conversation between Green (then in prison) and Rodgers, in which Rodgers offered to kill Johnson.[6] Two witnesses testified, furthermore, that Rodgers had provided them each with guns, one for the murder of Wright, and another weapon that the jury might have inferred from the evidence was to have been used to kill Johnson. The government also presented compelling evidence that Rodgers was a major street-level dealer, who sold substantial quantities of drugs for the enterprise. Rodgers worked on consignment. Members of the L.A. Boys delivered cocaine to him, and he later paid for the drugs out of the profits earned from his retail sales. The jury explicitly found him guilty of participation in the narcotics conspiracy.
 
 
 41
 Once again, as in Wong, where a defendant had been "convicted of a conspiracy to commit murder in furtherance of the [enterprise's] operations," 40 F.3d at 1374, Rodgers' participation in the L.A. Boys' murder plot and its narcotics activities placed him at a sufficiently high level in the enterprise to constitute involvement in the organization's "operation or management" under § 1962(c). Reversal is not required despite the erroneous charge. See Napoli, 32 F.3d at 36; Tillem, 906 F.2d at 824-25.
 
 III. Green's Other Claims of Error
 A. Wiretap Orders
 
 42
 Based upon the recordings made of Green's prison telephone conversations, the FBI sought and received a series of wiretap orders--allowing law enforcement officials to monitor other calls made from the telephone numbers that Green was calling from prison. Green challenges the validity of these orders.
 
 
 43
 He argues principally that the Assistant Attorney General ("AAG") who authorized the initial wiretap application lacked the authority to seek wiretap orders at the time the applications were made. Pursuant to 18 U.S.C. § 2516(1), "any Assistant Attorney General" who has been "specially designated by the Attorney General, may authorize an application to a Federal judge ... for ... an order authorizing or approving the interception of wire or oral communications...." The authorizing AAG had been designated under § 2516(1) by a prior Attorney General ("AG"). However, at the time the AAG authorized the initial wiretap application, the designating AG had departed, and a newly appointed AG had not yet revested him with the necessary statutory authority. The AAG ultimately was designated to issue wiretaps by the incoming AG, roughly six months after the AG's appointment.
 
 
 44
 Green's claim is without merit. We rejected a similar argument in United States v. Terry, 702 F.2d 299 (2d Cir.), cert. denied, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), ruling that "[a]dministrative continuity requires that the designation by an outgoing [AG] of Assistants to authorize electronic surveillance remain valid at least for a reasonable time after the [AG] leaves office, even without an express redesignation by his successor." Id. at 311; see also United States v. Nanfro, 64 F.3d 98 (2d Cir.1995). There is nothing unreasonable about the period of time that elapsed here.
 
 B. Interception of Prison Mail
 
 45
 The government introduced as evidence at trial a series of letters that Green sent to his co-conspirators while in prison. Green argues that the interception of this correspondence violated his First and Fourth Amendment rights, and that the evidence should have been suppressed. We disagree.
 
 
 46
 In Wolfish v. Levi, 573 F.2d 118 (2d Cir.1978), rev'd in part on other grounds sub nom., Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we noted with approval the district court's ruling that "where good cause is shown, outgoing mail can be read" without violating inmates' First Amendment rights. Id. at 130 n. 27; see also Heimerle v. Attorney General, 753 F.2d 10, 13 (2d Cir.1985) ("Supreme Court's reversal of portions of [the district court's] order [in Wolfish ] left the mail provision undisturbed"). Since the time of Wolfish, furthermore, the Supreme Court decided Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261-62, 96 L.Ed.2d 64 (1987), which is considerably more deferential to restraints imposed by prison officials on inmate rights than the standard of Procunier v. Martinez, 416 U.S. 396, 413-14, 94 S.Ct. 1800, 1811-12, 40 L.Ed.2d 224 (1974), which prevailed when Wolfish was decided. See Rodriguez v. James, 823 F.2d 8, 12 (2d Cir.1987) (applying Turner analysis in First Amendment challenge to prison mail policy).
 
 
 47
 The monitoring of Green's mail was based on good cause. Tasker--the afternoon watch commander at the prison--had requested it on the basis, in part, of Green's overheard telephone conversations, in which he continued to conduct drug trade and discussed committing contract murders. This information constituted good cause for inspecting Green's mail. Indeed, Green does not argue that the prison officials lacked reasonable ground for suspicion that he was engaging in illegal activities.[7] We conclude that there was no First Amendment violation.
 
 
 48
 As for Green's Fourth Amendment claim, under the analysis of Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), any restriction of Green's privacy interests is justified to the extent that it is "reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. at 2261. The investigation and prevention of ongoing illegal inmate activity constitute legitimate penological objectives. See Thornburgh v. Abbott, 490 U.S. 401, 411-12, 109 S.Ct. 1874, 1880, 104 L.Ed.2d 459 (1989) (noting that "[d]angerous outgoing correspondence" in prison context posing a "serious threat to prison order and security" includes "plans relating to ongoing criminal activity"). The monitoring of Green's mail was reasonably related to that interest. Without doubt, there was a "valid, rational connection," Turner, 482 U.S. at 89, 107 S.Ct. at 2262, between the decision to impose a watch on Green's mail and the desire to ensure the good order of the prison and the rehabilitation of prisoners by preventing Green from engaging in illegal activities while incarcerated. Furthermore, "the absence of ready alternatives is evidence of the reasonableness" of the prison's practice. Id. at 90, 107 S.Ct. at 2262. Green's mail was inspected after an individualized decision was made that the monitoring was necessary. The surveillance was founded on the prison officials' reasonable suspicion that Green in particular might be engaging in criminal conduct. No easily implemented alternative practice could both accommodate the prison's legitimate interest in security and rehabilitation, and further protect inmates' constitutional interests.
 
 
 49
 We think it clear that--at least where prison officials have reasonable cause for suspicion--surveillance of inmate mail is unobjectionable under the Fourth Amendment. We therefore reject Green's claim that the admission of his prison letters was error.
 
 
 50
 IV. Other Claims of Error with Respect to Jamison
 
 
 51
 A. Evidentiary Sufficiency with Regard to Bolden Murder
 
 
 52
 Jamison argues that the evidence relied upon to demonstrate his intent to kill Bolden was insufficient to support his murder conviction under N.Y.Penal Law §§ 125.25, 105.15, 20.00. Jamison must carry a heavy burden in order to prevail on this claim. See United States v. Martinez, 54 F.3d 1040, 1042 (2d Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995). We view the evidence in the light most favorable to the government, and draw all permissible inferences in its favor. Id. Where, as here, the issue is one of intent, the question is whether "the inferences [in favor of the government] are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." Id. at 1043.
 
 
 53
 The government's evidence of Jamison's intent was sufficient. The evidence showed that: (1) the Bolden murder was preceded by a fight between the intended victim[8] and Jamison, in which Jamison was beaten up, suggesting a motive; (2) Jamison was the driver in the drive-by shooting that killed Bolden, allowing the jury to infer that Jamison acted with intent since driving a vehicle under such circumstances requires certain advance planning and purposive technical finesse; (3) Jamison's driver's side window was down shortly after the murder, suggesting that he may have been the triggerman; (4) he had purchased an Uzi the week before, and a similar weapon had been used in the murder; and (5) he had served as a hit man for the L.A. Boys in the past.
 
 
 54
 While the government's case was not air-tight, with all permissible inferences drawn in its favor, the evidence was sufficient to support Jamison's conviction.
 
 
 55
 B. Ineffective Assistance of Counsel Relating to Jamison's Sentence for the Bolden Murder
 
 
 56
 Jamison argues that his counsel rendered ineffective assistance in failing to challenge the application of base offense level 43, under U.S.S.G. § 2A1.1, to the racketeering act involving his murder of James Bolden. He contends the base offense level should have been 33, under U.S.S.G. § 2A1.2. Section 2A1.1 is designed to apply to federal first degree murder, which is defined by 18 U.S.C. § 1111(a) to include premeditated murder. Under § 1111(a), any murder not classified as first degree murder is second degree murder. Guideline § 2A1.2, with its base offense level of 33, covers second degree murder.
 
 
 57
 One of the racketeering acts which Jamison was found guilty of was the crime of murder in the second degree under the law of New York, see N.Y.Penal Law § 125.25, which is New York's highest category of murder of general applicability.[9] New York law does not employ the concept of "premeditated" murder. Both the first degree and second degree murder statutes apply when the defendant has killed "[w]ith intent to cause the death of another person." N.Y.Penal Law §§ 125.25, 125.27.
 
 
 58
 Jamison contends that the jury's finding that he killed with intent to cause death does not necessarily mean that he acted with premeditation. He argues further that the evidence supporting premeditation was weak, and that had the trial judge had this issue before him he might have thought it more appropriate to sentence Jamison under the guidelines for those convicted of federal second degree murder. Had the district court done so, Jamison's sentence might have been diminished considerably.
 
 
 59
 Jamison asks that we find his trial counsel's failure to raise this point constituted ineffective assistance of counsel, see Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and remand--either for resentencing or, in the alternative, for a hearing on his claim. We may find ineffective assistance of counsel only upon determining that his trial counsel's behavior fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, 104 S.Ct. at 2064-65, and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694, 104 S.Ct. at 2068.
 
 
 60
 Because this point was not raised in the district court, the record is undeveloped as to trial counsel's decisionmaking process at the time of sentencing. Although the potential advantages that might have resulted from contesting the application of § 2A1.1 are obvious, we cannot tell whether there were also potential disadvantages that led counsel to make a strategic decision not to raise it. Such considerations might include the possibility that, in addressing the issue of premeditation, the government would adduce evidence seriously damaging to the defendant's sentencing prospects. There is no reason to suppose that any such evidence possessed by the government had already been revealed. First, at a sentencing the government could rely on hearsay that was not admissible at trial. Second, since Jamison's co-defendants had been convicted and were awaiting sentencing, some of them might have been eager to cooperate by becoming witnesses against him. It is impossible for us to determine on this record whether counsel's behavior was objectively unreasonable. See United States v. DeFusco, 949 F.2d 114, 120-21 (4th Cir.1991), cert. denied, 503 U.S. 997, 112 S.Ct. 1703, 118 L.Ed.2d 412 (1992).
 
 
 61
 Jamison suggests that under these circumstances the best course is a remand for a new hearing in which the district court would make factual findings relevant to his ineffective assistance claim. We disagree. Although we did note in Billy-Eko v. United States, 8 F.3d 111, 116 (2d Cir.1993), that where an ineffective assistance claim is brought before us in the first instance on a record insufficient to permit appellate adjudication, the court of appeals has the option "to either remand the claim to the district court or leave the defendant to his post-conviction remedies by declining to rule on the claim," we did not suggest that remand is ordinarily the appropriate course. To the contrary, "[t]his suggestion was certainly not stated ... as a mandatory requirement, and such claims are ordinarily pursued by a subsequent § 2255 petition." Riascos-Prado v. United States, 66 F.3d 30, 35 (2d Cir.1995); see United States v. Aulet, 618 F.2d 182, 185-86 (2d Cir.1980); see also United States v. McGill, 952 F.2d 16, 19 & n. 5 (1st Cir.1991). We do not find any extraordinary circumstance here that would justify departing from our usual practice. Cf. United States v. Tarricone, 996 F.2d 1414 (2d Cir.1993) (remanding for evidentiary hearing on direct appeal of conviction where ineffective assistance claim was raised in district court by new trial counsel on motion for new trial).
 
 
 62
 Jamison's decision to raise this claim on direct appeal, rather than waiting to bring it before the district court in the first instance on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255, is apparently driven by our statement in Billy-Eko that under certain circumstances new appellate counsel's failure to raise an ineffective assistance claim on direct appeal would constitute a procedural bar to later adjudication of that claim in a § 2255 proceeding. See Billy-Eko, 8 F.3d at 115. However, we noted that this rule would apply only where "the record is fully developed on the ineffective assistance issue," generally because "the claim is based solely on the record developed at trial." Id. That is not the case here. Although we decline to address Jamison's claim, we note that in doing so we do not in any way prejudice his opportunity to raise this argument in a subsequent § 2255 proceeding, in which he would have the opportunity to develop the underlying factual record. See McGill, 952 F.2d at 19 n. 5.
 
 C. Government's Cross-Appeal
 
 63
 At sentencing, the trial judge granted Jamison a two-level downward departure in his offense level, from 44 to 42, to take into account his rehabilitation. The government cross-appeals, contesting this decision.
 
 
 64
 The facts underlying the trial judge's decision are persuasive. Upon finishing service of a 152-day sentence in Michigan for another offense in the fall of 1990, Jamison left the L.A. Boys and joined the U.S. Army. The government does not contest that Jamison rehabilitated himself and completed his military service honorably. This rehabilitation was not undertaken at the spur of impending prosecution for the crimes at issue in this appeal. It was an independent (and quite impressive) effort.
 
 
 65
 In United States v. Maier, 975 F.2d 944, 948 (2d Cir.1992), we ruled that post-arrest rehabilitation efforts by drug-addicted defendants may justify downward departures under appropriate circumstances. See also United States v. Williams, 65 F.3d 301, 307 (2d Cir.1995); United States v. Rodriguez, 724 F.Supp. 1118 (S.D.N.Y.1989). While this is not a uniformly accepted rule, it is the law of this circuit. Maier, 975 F.2d at 946. Jamison's apparently complete pre-arrest rehabilitation, although not on all fours with Maier, falls within its ambit.[10] The trial judge was fully within his authority in granting Jamison a downward departure for rehabilitation.
 
 V. Rodgers' Other Claims of Error
 
 66
 In addition to his argument that the RICO conspiracy charge was erroneous under Olano, Rodgers claims that the jury charge was flawed in a number of other ways. These claims are without merit. Rodgers argues, inter alia, that he was prejudiced by the district court's failure to give a multiple conspiracy charge. To benefit from such a charge, a defendant must show "that there was evidence of separate networks operating independently of each other and that he suffered substantial prejudice resulting from the failure to give the requested charge." United States v. Maldonado-Rivera, 922 F.2d 934, 962-63 (2d Cir.1990) (internal quotations omitted), cert. denied, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). There was no evidence of separate networks here.
 
 
 67
 Rodgers also claims that the jury charge on the RICO offense did not make clear to the jury that the two racketeering acts with which he was charged had to be interrelated and had to pose a threat of continued racketeering activity in order to satisfy RICO's "pattern" requirement. See 18 U.S.C. §§ 1961(5), 1962(c). We disagree. The jury charge was clear on these points, and complied with our holding in United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.) (en banc), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). See also H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).
 
 
 68
 Rodgers argues, furthermore, that he was prejudiced by the district court's refusal to charge the jury as to one of his defense theories--that he was not a drug dealer at all but only an end user with a voracious appetite for cocaine. It is true that "a criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court." United States v. Dove, 916 F.2d 41, 47 (2d Cir.1990). Given the almost complete absence of any evidentiary foundation for such an instruction here, however, we find it difficult to fault the district court for refusing to give it. In any event, the failure to instruct the jury in this manner was not prejudicial to Rodgers given the paucity of the evidence in support of this defense theory--and the government's overwhelming proof to the contrary that Rodgers was a major drug dealer. See id. at 45 (defendant must show that the instructions, taken as a whole, were prejudicial).[11]
 
 Conclusion
 
 69
 We have considered the other claims of the defendants, and of the government on its cross-appeal, and find them to be without merit. The judgments of conviction are affirmed.
 
 
 
 [1]
 This was the third grand jury indictment in the case, and the one upon which the government proceeded to trial
 
 
 [2]
 In Willoughby, the inmate also expressly agreed to be monitored by signing a consent form. 860 F.2d at 20. However, we made clear that use of the telephones in any event constituted implied consent, given the orientation lecture and the notification sign near the telephone. Id
 
 
 [3]
 Rodgers' argument that he should not be bound by Green's consent, similarly misunderstands the statutory framework. Title III clearly specifies that only "one of the parties to the communication" must consent. See 18 U.S.C. § 2511(2)(c) (emphasis added)
 
 
 [4]
 We recognize a tension with United States v. Sotomayor, 592 F.2d 1219 (2d Cir.), cert. denied, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). In that case, we suggested that under the narrow circumstances where a state warrant was obtained in violation of "state statutory requirements or standards that are designed to protect an individual's right of privacy," id. at 1225, federal courts would apply the state's statutory provisions even if they were more rigorous than the requirements of federal law. See also United States v. Lilla, 699 F.2d 99, 102 n. 3 (2d Cir.1983). This conclusion is somewhat at odds with our holdings in more recent cases. See, e.g., Rowell, 903 F.2d at 902 (criticizing reasoning of Sotomayor ). It is also in conflict with the decisions of several other circuits. See Butera, 677 F.2d at 1380; Nelligan, 573 F.2d at 253; United States v. Testa, 548 F.2d 847, 856 (9th Cir.1977); but cf. United States v. McNulty, 729 F.2d 1243, 1264-66 (10th Cir.1984) (en banc ) (adopting narrow reading of Sotomayor ). We follow our recent--and more closely analogous--decisions in Rowell, Pforzheimer, and their progeny
 
 
 [5]
 A third co-defendant and government witness, Norman Workman, repeatedly described Rodgers as a "customer" to whom he provided drugs for the organization's retail sales
 
 
 [6]
 The evidence did not suggest that Rodgers took any further action in this regard. The murder was actually to have been committed by Felder
 
 
 [7]
 Green does suggest that the process by which this finding was made was defective, because in contravention of applicable regulations, the Superintendent of the prison failed in his written authorization of the mail surveillance to "set forth specific facts forming the basis for the action." Even if Green were to raise the claim more directly, we would not be persuaded that this technical violation of the prison's regulations constitutes grounds for suppression. Where, as here, there is sufficient basis for the decision to institute a mail watch, the Constitution does not in our view require suppression of the evidence gathered during the surveillance merely because the relevant supervising official, when approving the mail watch, failed to restate in writing the facts underlying the decision
 
 
 [8]
 As it happened, in shooting Bolden, the attackers killed the wrong man. However, all agree that under N.Y.Penal Law § 125.25, this is of no moment for purposes of determining the intent of the parties
 
 
 [9]
 At the time of Jamison's conviction, first degree murder in New York applied only to killings of police officers, prison guards, and killings by persons already sentenced to life imprisonment. N.Y.Penal Law § 125.27
 
 
 [10]
 The government cites to cases from other circuits denying downward departures, inter alia, for periods of military service. These authorities are inapplicable here. United States v. Ziegler, 1 F.3d 1044, 1049 (10th Cir.1993), rests on the logic disavowing downward departures for rehabilitation that we rejected in Maier. United States v. Desormeaux, 952 F.2d 182, 185-86 (8th Cir.1991), is inapposite for similar reasons. United States v. Peters, 978 F.2d 166, 171 (5th Cir.1992), is also not on point. That case denies a downward departure for military service itself, not for service done after the offenses were committed as a sign of rehabilitation. United States v. McCaleb, 908 F.2d 176, 179 (7th Cir.1990), noted that military service could in principle warrant a downward departure, but affirmed the discretionary denial of such a departure by the district court
 
 
 [11]
 Rodgers also raises objections to the calculation of his offense level under the Guidelines. These claims are meritless. There was sufficient evidence to support the imposition of enhancements for weapons possession and receipt of pecuniary gain from the conspiracy to murder Johnson. Similarly, the district court made appropriate factual findings as to the date of Rodgers' entry into the conspiracy, and the quantity of drugs attributable to him. We see no clear error in these determinations. See United States v. Ekwunoh, 12 F.3d 368, 370 (2d Cir.1993). We are also unpersuaded by Rodgers' arguments that the district court erred by failing to grant downward adjustments for minor role in the offense or acceptance of responsibility