**UNITED STATES of America,**

v.

**K, Defendant.**

**No. 00–CR–951 (JBW).**

United States District Court,
E.D. New York.

May 31, 2001.

Loretta Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, By Noah B. Perlman, Esq., for the United States of America.

Arthur L. Aidala, Brooklyn, NY, By Arthur L. Aidala, Esq., for the Defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

I.    *Introduction:* .................................................423

II.   *Facts:* .....................................................423
    A.   K's Background.............................................423
    B.   Offense ..................................................424
    C.   Procedural History .........................................424
        1.  Arraignment ........................................424
        2.  Post–release activity ..................................424
        3.  Sentencing hearing on rehabilitation .....................425
        4.  Post–sentencing–hearing activity .......................425
    D.   Special Options Rehabilitation Service (S.O.R.S.) Program Before Imposition of Sentence.............................................426
        1.  Purpose ...........................................426
        2.  Selection process ...................................426
        3.  Methodology........................................426
        4.  Selection of K ......................................427

III.  *Law: Can the Court Defer K's Sentencing to Consider Likelihood of Rehabilitation?*...................................................427
    A.   Rehabilitation Defined .....................................427
    B.   History of Rehabilitation As a Goal of Sentencing ...............428
    C.   Sentencing Reform Act Promotes Solving Prison Overcrowding through Rehabilitative Alternatives to Incarceration ...........................430
        1.  Solving prison overcrowding ...........................431
        2.  Rehabilitative alternatives to incarceration...............432
    D.   Prisons Still Tend to Be Overcrowded and Criminogenic .........434
    E.   The Eastern District's Program Stressing Rehabilitation Before Sentence is Appropriate under the Guidelines .................................436
        1.  Existing sentencing options under the Guidelines .........437
           a.  Pre–Trial diversion by federal prosecutors ..........438
           b.  Sentencing alternatives to incarceration by judges ....439
        2.  S.O.R.S. program.....................................439
    F.   Departing Downwardly from the Guidelines ...................440
        1.  Discretion of the sentencing court .....................440
        2.  Grounds...........................................441
           a.  Probabilities of rehabilitation.......................441
           b.  Physical and emotional vulnerability.................443
           c.  Family circumstances ............................444

IV. Application of Law to Facts: .........................................444
    A. Postponing Sentencing to Permit K to Complete S.O.R.S. Program Comports with the Primary Objectives of Modern Sentencing Reform.....444
    B. Possible Grounds for Ultimately Departing in K's Case ....................445
        1. Probabilities of rehabilitation.....................................445
        2. Physical and emotional vulnerability ...............................446
        3. Family circumstances ...........................................446

V. Conclusion: ............................................................447

## I. *Introduction:*

The question posed is whether the court may defer sentence of a defendant to permit him to complete the Special Options Rehabilitation Service (S.O.R.S.) Program, an innovative remediation procedure administered by this district's Pretrial Services officers. The answer is yes. While protecting the public, the federal district judge's duty is to try to save as many of the people before the court as it can—one person at a time in accordance with the law.

Defendant's continued participation in the S.O.R.S. program will enable the court to evaluate rehabilitation of defendant before sentencing him. Sentencing can be deferred to allow this young, nonviolent offender—whose physical and mental fragility renders him particularly susceptible to abuse in prison—further time to demonstrate rehabilitation under the strict control of Pretrial Services.

This approach permits appropriate and necessary circumvention on a case-by-case basis of rigid Guidelines that in some cases have unnecessarily destroyed the lives of defendants—particularly minorities—and their families, and added substantially to taxpayers' burdens by requiring the construction of a large and rapidly expanding prison system. As demonstrated below, unnecessary cruelty by requiring incarceration in cases such as this one is not required by federal law.

Once it imposes sentence, the court under the Guidelines lacks the power to modify the sentence to meet changing circum-stances and demonstrated rehabilitation unless upon the request of the prosecutor. *See* Fed.R.Crim.P. 35(b), (c) (reduction of sentence); U.S. Sentencing Guidelines Manual § 5K2.19 (2000) (post-sentencing rehabilitation efforts after sentence of a term of imprisonment are not permitted). Deferring sentencing in selective cases allows the court to follow the statutory requirement that rehabilitation be considered as one of the viable and continuing sentencing criteria. *See* 18 U.S.C. § 3553(a)(2)(D). Saving rather than destroying defendants is permitted under the Guidelines.

## II *Facts:*

### A. K's Background

K is a twenty-one year old Asian–American male. He is slight in build and reticent. Born in mainland China, he is the elder of his parents' two children. The family emigrated to the United States when defendant was four years old. He is a United States citizen. His sister is attending college.

Defendant's parents speak little English. They have worked long hours at low-paying jobs to meet the family's financial needs. K's father is employed as a cook in a Bronx restaurant. Until recently his mother was a seamstress in a garment factory. Defendant's grandfather, unable to speak or read English, babysat for the two children when they were younger.

A severe learning disability hampered defendant in school. He began experi-

menting with drugs at a young age. Unbeknownst to K's parents, defendant dropped out of high school in the ninth grade. When defendant left school, his polysubstance abuse escalated, including Ecstasy, cocaine, Quaaludes, LSD, Valium, marijuana and alcohol.

Psychiatric evaluations reveal that defendant functions in the low-average range of intelligence, with poor insight and judgment. Until recently he was unemployed and dependent on his parents for financial support.

Since K's arrest, his mother has become terminally ill. She lost her job at the garment factory and is without medical insurance. As required by his Pretrial Services officer supervising defendant while he is on bail, K is now working fulltime at a Brooklyn auto electronics shop. His co-workers describe him as hard-working, friendly, and unfailingly polite. He contributes all but $20 of his weekly salary to his mother's health care costs. K now plans to prepare for a vocation helping poor people in the health field.

### B. Offense

In April 2000, at a time when defendant was unemployed and drug-dependent, he was contacted by two government informants masquerading as prospective buyers. Defendant met with the informants at his parents' residence in Brooklyn where he agreed to supply them with 15,000 tablets of methylenedioxyamphetamine, a drug commonly known as Ecstasy, by July 4, 2000. K could supply only 1,000 tablets. Despite continuing negotiations, ultimately, he was unable to procure any additional tablets. K was arrested in August 2000.

### C. Procedural History

#### 1. Arraignment

Defendant pled guilty in December 2000 to one count of knowingly and intentionally attempting to distribute, and possessing with the intent to distribute, Ecstasy in violation of sections 841(b)(7)(c) and 846 of Title 21 of the United States Code. Significantly, the government agreed to base the plea on the 1,000 tablets of Ecstasy the defendant actually sold rather than on the 15,000 tablets he allegedly conspired to sell, thereby reducing estimated incarceration under the Guidelines from 46–57 months to an estimated 12–18 months. He was released on bail.

#### 2. Post-release activity

Following his release from jail, defendant was cooperative, compliant and eager to please. He met with his Pretrial Services officer several times a week. K's Pretrial Services officer referred him to the Fortune Society, where he attended remedial classes twice weekly in preparation for the General Equivalency Diploma examination. He received passing scores on two G.E.D. pretests. He also provided clerical services as a volunteer at both the Fortune Society and the Manhattan office of the Legal Aid Society.

A routine criminal record check in February 2001 revealed that K had been arrested in December 2000 and charged with Aggravated Harassment in the New York state court system. He had allegedly left a menacing message on the answering machine of someone who owed him money.

When confronted with the arrest and his failure to report the incident to his Pretrial Services officer, the defendant insisted that he was "just kidding around." The state prosecutor identified K as a likely candidate for rehabilitation. The misdemeanor charge was deemed "adjourned in contemplation of dismissal." That means that the state prosecution is postponed with a view to ultimate dismissal if the

defendant stays out of trouble for six months. *See* N.Y.Crim. P. Law § 170.55(1), (2), (8) (McKinney 2000).

### 3. Sentencing hearing on rehabilitation

In March of 2001, defendant, accompanied by his attorney, appeared for sentencing. Defendant's Pretrial Services officer as well as a representative of Probation who had prepared the presentence report were present. The court asked defendant to summarize his progress in the S.O.R.S. program. K responded, "I'm going for my G.E.D. right now .... Working [a]t the Legal Aid, clerical work .... I'm going into this thing called Vesid ... for people who have learning disabilities to help you find a job." Defendant was extremely timid and soft-spoken. He appeared sincere and somewhat naive, a person open to suggestion.

Several other people appeared in support of K. His mother, father and uncle were present. K's attorney described how defendant had started to take a keen interest in his own future because of his work with Pretrial Services. Following counsel's statement, K's Pretrial Services officer discussed his progress in mental health counseling, volunteer work and academics. The General Equivalency Diploma Coordinator at the Fortune Society submitted a letter commending K for his academic achievements, positive attitude, and desire "to further his education and be a credit to his community."

Based on this record of adjustment K's Pretrial Services officer opined that defendant's criminal behavior could best be curtailed through additional supervision by Pretrial Services and treatment for his learning disability. She stated, "[K] does have very poor judgment, but I think if he is guided properly, that judgment might be improved." `

The government suggested that defendant be enrolled in the Shock Incarceration program, a six-month correctional boot camp for low-risk offenders, as an alternative to the 12 to 18 months of incarceration that the Sentencing Guidelines required. The court was reluctant to follow this suggestion partly because of recent studies indicating that the Shock Incarceration program has not proved effective in preventing recidivism among young naive offenders like K. *See, e.g.,* Faith E. Lutze, "No Greater Rehabilitation Found in Shock Incarceration Programs," 15 Justice Quarterly 547 (1998) (shock incarceration programs are not proving successful in lowering rates of recidivism for young offenders because they lack "two components—a safe environment and a climate in which support and emotional feedback are provided to reinforce internal change—necessary for successful rehabilitation."); Correctional Boot Camps: A Tough Intermediate Sanction 293–94 (U.S. Department of Justice 1996) ("[R]esults clearly show that the core elements of boot camp programs—military-style discipline, hard labor, and physical training—by themselves did not reduce offender recidivism."); David C. Anderson, *Sensible Justice, Alternatives to Prison* 139 (1998) (boot camps do not rehabilitate, but save money by shortening sentences).

Because of K's progress in the S.O.R.S. program, the court decided not to sentence him immediately. It warned K that he must fully cooperate with the Pretrial Services officer, and admonished the defendant's family about the need for their support.

### 4. Post-sentencing-hearing activity

K has thus far complied with all of the conditions of his release. He has continued to make significant strides toward rehabilitation. Defendant maintains full-time,

paid employment, continues to work toward his General Equivalency Diploma, attends weekly sessions with his Pretrial Services officer and mental health counselor, tests negatively for the presence of drugs, and abides by his 9:00 p.m. curfew. K's rehabilitation is further facilitated by the support of his family, with whom he continues to live.

### D. The Special Options Rehabilitation Service (S.O.R.S.) Program Before Imposition of Sentence

Shortly after K's arrest, the magistrate judge recommended him to Carlene Jadusingh of this district's Pretrial Services as a likely candidate for the S.O.R.S. program. Ms. Jadusingh interviewed the defendant in jail, and determined that he was eligible. The defendant was released three days later on a $250,000 secured bond. He was immediately enrolled in the S.O.R.S. program.

#### 1. Purpose

The purpose of the S.O.R.S. program is to provide courts with an alternative to sentencing in the case of young, nonviolent offenders whose backgrounds demonstrate a high probability of rehabilitation under proper guidance. Defendants are monitored and supervised intensively prior to sentencing with an aim of stabilizing the defendant's behavior and reducing the risks of recidivism.

#### 2. Selection process

The magistrate judge or judge may order participation in the S.O.R.S. program as a "Special Condition" of bail. The criteria for selection in the program are still being developed; it was launched only last year. Generally defendants are ordered to participate in the S.O.R.S. program only if Pretrial Services agrees and they meet one or more of the following requirements: 1) a history of unemployment or sporadic employment; 2) HIV and/or AIDS; 3) battered women's syndrome; and 4) need for direction or supervision. Offenders must be twenty-one years old or younger without a prior criminal record and lack a sufficient parental or otherwise beneficial influence in their lives.

#### 3. Methodology

The S.O.R.S. program is premised on the notion that efforts to rehabilitate criminal offenders are most successful when social services programs tailored to the defendant's individual needs are combined with adequate law enforcement. It provides defendants with counseling, job training, employment placement, community service placement, education, vocational training, and referrals for jobs and housing when needed.

Pretrial Services has referred S.O.R.S. participants to a wide range of not-for-profit service providers. The Fortune Society, a community based organization dedicated to educating the public about prisons, criminal justice issues, and the root causes of crime, helps participants through education, job training, and job placement. The Bridge, Inc., a New York City-based agency whose mission is to serve adults with mental health problems or disabilities that prevent them from leading productive lives, provides S.O.R.S. participants with mental health treatment as well as vocational training.

Social services are coupled with strictly enforced conditions of release, including frequent random drug testing, curfews, and on-site visits by the Pretrial Officer to the defendant's home, place of employment and counseling center to ensure that the defendant is fulfilling his or her responsibilities. In addition to insisting that the defendant complies with the conditions of release, it is the duty of the Pretrial Offi-

cer to make sure that he or she promptly returns to court when required—with revocation of bail and swift sentencing likely if the defendant fails to act appropriately.

### 4. Selection of K

In addition to meeting the age and employment history requirements of the S.O.R.S. program, K struck his Pretrial Services officer as someone who could benefit from direct supervision and guidance. He was polite and generally cooperative during the Pretrial Interview. He attributed his criminal conduct primarily to boredom. Defendant admitted that prior to his arrest he had ingested as many as twenty Valiums per day with alcohol, leaving him in a perpetual "daze."

The conditions of release crafted for K illustrate how the S.O.R.S. program combines social services and law enforcement. K was required to: 1) participate in the Pretrial Services program; 2) report to Pretrial Services regularly; 3) refrain from the use of all illegal drugs and alcohol and submit to frequent drug testing and treatment; 4) avoid interaction with anyone who has been convicted of a crime or involved in criminal activity; 5) undergo mental health treatment; 6) work toward obtaining his General Equivalency Diploma; 7) seek and maintain gainful employment; 8) remain within the confines of New York City; and 9) abide by a 9:00 p.m. curfew.

### III. *Law: Can the Court Defer Sentencing to Consider Likelihood of Rehabilitation?*

Adjournment of sentence is permitted to allow the court to determine defendant's postoffense, presentence rehabilitation and to explore and consider a full range of appropriate sentencing alternatives. *See United States v. Flowers,* 983 F.Supp. 159, 160 (E.D.N.Y.1997). Deferring final adjudication in a criminal proceeding to allow a defendant time needed to improve his circumstances is not new to the law. *See id.* Reasonable delays may help ensure that the sentence fits both the crime and the circumstances of defendant, his family, and his community. *See id.*

### A. Rehabilitation Defined

Rehabilitation theory assumes that the behavior of criminals is mutable and that they can learn to conform to social norms: a crime is committed because of some ethical or moral defect in context of an environment that can be repaired, enabling the criminal to return to "normal" behavior. *See, e.g.,* Black's Law Dictionary 1287 (6th ed.1990) (defining rehabilitation as "[r]estoration of individual to his greatest potential, whether physically, mentally, socially, or vocationally"); The Compact Edition of the Oxford English Dictionary 2474 (1971) (defining "rehabilitate" as "[t]o restore to a previous condition; to set again in proper condition").

Often rehabilitation has been described in terms of a moral transformation of the criminal through instruction in an ethical system. *See, e.g.,* Markus Dirk Dubber, *The Right to be Punished: Autonomy and its Demise in Modern Penal Thought,* 16 Law & Hist. Rev. 113, 143 (1998). Attempts to instruct the offender in a trade or livelihood is an historic rehabilitative strategy. *See, e.g.,* George Fisher, *The Birth of the Prison Retold,* 104 Yale L.J. 1235, 1279 (1995). Strict regimens of work and prayer in prison were considered the most effective way to rehabilitate prisoners during the eighteenth century. David C. Anderson, *Sensible Justice, Alternatives to Prison* 3 (1998). Nineteenth-century prison administrators focused on education in addition to religion and labor as a means of rehabilitation. *See id.* For much of the twentieth century, psychia-

trists, psychologists and social workers were also relied upon to administer therapies that might alter a prisoner's "character" for the better. *See id.* at 3–4.

Controlling post-incarceration environment, to reduce pressures and occasions for reversion to criminal conduct, has too often been neglected. Supervised release may reduce these adverse community influences. *See* 18 U.S.C. §§ 3583 (inclusion of a term of supervised release after imprisonment), 3601 (probation's authority over those persons placed on supervised release), 3603 (probation's duties with respect to persons placed on supervised release), 3606 (procedure when person on supervised release violates a condition of release).

### B. History of Rehabilitation as a Goal of Sentencing

Taking into account plans and hopes for a defendant's rehabilitation is consistent with developments in United States law. For much of American history a central rationale of sentencing has been the rehabilitation or "reformation" of the defendant. *See, e.g., Williams v. New York*, 337 U.S. 241, 247–48, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) ("Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence"); Arthur W. Campbell, Law of Sentencing, § 2:4, at 29 (2d ed. 1991) ("[R]ehabilitation continued as the country's dominant sentencing rationale until the 1970's."); Robert O. Dawson, *Sentencing: The Decisions as to Type, Length, and Conditions of Sentence* 3 (1969) ("One of the major goals of the correctional process is the rehabilitation of the convicted offender."); *see also* 18 U.S.C. § 3553(a)(2) (punishment should serve "educational ... goals"); Lawrence M. Friedman, *Crime and Punishment in American History* 63–82 (1993). This focus on rehabilitation was temporarily ne-

glected toward the end of the twentieth century.

Early efforts at rehabilitation in the American criminal justice system were largely targeted at reforming offenders while they were incarcerated. *See* Adam Jay Hirsch, *The Rise of the Penitentiary: Prisons and Punishment in Early America* 59 (1992) ("Postrevolutionary carceral institutions conformed to the rehabituative tradition .... The new ideological element that caused all the commotion was solitary confinement and the theory of reclamation."); Lawrence M. Friedman, *A History of American Law* 521 (1973) (describing such prison reform experiments as Newgate in New York and Walnut Street in Philadelphia, which were ultimately unable to maintain their rehabilitative orientations due to vast demographic and political changes); *see also* Matthew W. Meskell, Note, *The History of Prisons in the United States from 1777 to 1877*, 51 Stan. L.Rev. 839, 848 (1999).

Nevertheless, support for the notion that offenders can be rehabilitated in prison was strong even as late as 1972, when the New York Times quoted the New York City Correction Commissioner as follows: " 'All men are redeemable. Every man can be rehabilitated, and it's up to us in the community and in the field of criminal justice to see that this is done." ' *See* Michael Vitiello, *Reconsidering Rehabilitation*, 65 Tul. L.Rev. 1011, 1011 (1991) (*quoting* Malcolm Tolchin, *A Black, Named Correction Chief by Mayor*, N.Y. Times, Jan. 20, 1972, at 1).

By the mid–1970's, judges and lawyers began expressing doubts about the efficacy of the rehabilitative model, and the inability of prison to reform criminals. *See* Robert Martinson, *What Works?— Questions and Answers About Prison Reform*, 36 Pub. Interest 22, 25 (1977) ("With few and isolated exceptions, the rehabilitative

efforts that have been reported so far have no appreciable effect on recidivism."); W. LaFave & A. Scott, Handbook on Criminal Law 28–29 (2d ed. 1986) ("[S]kepticism regarding the rehabilitative model began developing in the mid–1960's, and about ten years later there came 'an explosion of criticism ... calling for restructuring of the theoretical underpinnings of the criminal sanction'"). *But see, e.g.,* David C. Anderson, *Sensible Justice, Alternatives to Prison* 4 (1998) (arguing that rehabilitation is still an important goal of sentencing and that in particular "[p]robation-based sanctions that combine effective supervision with treatment, counseling, work and restitution are useful vehicles for pursuing that goal."); Grant E. Coulson & Verna Nutbrown, *Properties of an Ideal Rehabilitative Program for High–Need Offenders,* 36 J. of Offender Therapy and Comp. Criminology 203, 203 (1992) ("Rehabilitation techniques reduce recidivism quite markedly in some circumstances with some types of offenders. The question is no longer whether offender rehabilitation is effective but what procedures are effective under what circumstances for what clients."); Michael Vitiello, *Reconsidering Rehabilitation,* 65 Tul. L.Rev. 1011,1053 (1991) ("Insofar as the [rehabilitative] model was rejected because of the widely held belief that rehabilitation did not work, more recent research suggests that position was wrong .... More subtle examination of the data suggests that some programs do work well and that more sophisticated criteria are available to determine who may benefit from different kinds of rehabilitative programs.").

Now the pendulum is swinging back. Punitive imprisonment and denial of training and education in prison aimed at helping ex-inmates earn an honest living are being recognized as too costly and destructive. Fox Butterfield, "Inmate Rehabilitation Returns as Prison Goal," N.Y. Times, May 20, 2001 at 1, 36 ("Finding ways to ease the return to society and reduce recidivism is the hot topic in the criminal justice system, because of the huge costs and numbers involved.") (quotations omitted).

It is not surprising that rehabilitation continues to be linked primarily with failed attempts to reform inmates while they are incarcerated. The great shortcomings of the American rehabilitative model have taken place in the context of incarceration. *See, e.g., Powell v. Texas,* 392 U.S. 514, 530, 88 S.Ct. 2145, 2153, 20 L.Ed.2d 1254 (1968) (plurality opinion) (Marshall, J.) ("[I]t can hardly be said with assurance that incarceration serves [therapeutic or rehabilitative] purposes ... for the general run of criminals"); Matthew W. Meskell, Note, *The History of Prisons in the United States from 1777 to 1877,* 51 Stan. L.Rev. 839 (1999) (eighteenth and nineteenth-century American penal system was founded on the philosophy of Dr. Benjamin Rush, who "argued that reformation and deterrence of crime ought to be the sole goals of punishment, that the contemporary criminal codes tended to harden criminals and engender hatred towards the government, and that imprisonment should be used as the primary criminal punishment."); Lawrence M. Friedman, *Dead Hands: Past and Present in Criminal Justice Policy,* 27 Cumb. L.Rev. 903, 909 (1996–97) ("Reformers in the early nineteenth century were sure that crime came out of the temptations of urban life; they also blamed hard liquor, and a general lack of discipline. The solution was prison, or rather, the 'penitentiary.'" Remove these people, surgically as it were, from society. "Lock them up in a grim fortress, put them in uniform, isolate them, cut their hair, subject them to the ultimate in regimentation and discipline."); George Fisher, *The Birth of the Prison Retold,* 104

Yale L.J. 1235, 1236 (1995) (rehabilitation of the prisoner has historically gone hand in hand with reform of the prison); Robert Martinson, *The Paradox of Prison Reform*, in *Philosophical Perspectives on Punishment* 309 (Gertrude Ezorsky ed., 1972) ("The moment prisons were established they were found wanting ...."). Yet, as is pointed out in further detail in Parts III.A., B. and C., *infra*, what is meant by rehabilitation, and where, when and how rehabilitation is best accomplished in the criminal justice system, and the relative importance of this goal in sentencing decisions has changed in recent years.

The current negative perception of rehabilitation is misleading. The historical record reveals successful instances of rehabilitation programs outside of prison. For example, the modern probation system is said to have begun in the United States in 1841, when a Boston boot maker named John Augustus offered to take charge of a drunk who had come before a police court. *See* David C. Anderson, *Sensible Justice, Alternatives to Prison* 4 (1998). Augustus returned the man to court three weeks later, sober and gainfully employed, at which time the judge fined him a penny plus costs and let him go. *Id.* This pioneer began bailing out likely rehabilitative risks on a regular basis, and was soon joined by volunteers. *Id.* His community-service efforts were so successful that in 1878, the Massachusetts legislature formalized release under court supervision, and before long other states followed. *Id.* Probation became the most widely imposed criminal sanction. *Id.* This was partly for practical reasons; the average yearly cost of supervising offenders in the community can cost some $20,000 less than incarcerating that individual—without even considering the high costs of constructing prisons. *Id.* at 4–5.

## C. Sentencing Reform Act Promotes Solving Prison Overcrowding Through Rehabilitative Alternatives to Incarceration

Congress restructured the federal sentencing law in the 1980's. *See* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 211, 98 Stat.1987, 1989–90 (1984); Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 38–49 (1998); Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 Wake Forest L.Rev. 223, 223 (1993). The Sentencing Reform Act of 1984 abolished parole, authorized the creation of a federal sentencing commission to produce sentencing guidelines, required judges to state reasons for their sentencing determinations, and permitted appellate review. *See* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 211, 98 Stat.1987, 1989–90 (1984); Douglas A. Berman, *Balanced and Purposeful Departures: Fixing a Jurisprudence that Undermines the Federal Sentencing Guidelines*, 76 Notre Dame L.Rev. 21, 36 (2000).

In fettering federal judges' discretion, Congress sought, among other things, to limit what were thought to be excessively disparate sentencing of similarly situated offenders. *See* S.Rep. No. 98–225, at 36 ("[T]he present practices of the federal courts and of the parole commission clearly indicate that sentencing in the federal courts is characterized by unwarranted disparity and by uncertainty about the length of time offenders will service in prison."); Kenneth R. Feinberg, *Federal Criminal Sentencing Reform: Congress and the United States Sentencing Commission*, 28 Wake Forest L.Rev. 291, 295 (1993) ("The first and foremost goal of the sentencing reform effort was to alleviate the perceived problem of federal criminal

sentencing disparity."); Marc Miller, *Purposes at Sentencing*, 66 S. Cal. L.Rev. 413, 421 (1992) ("Federal sentencing reform came about as a consequence of widespread dissatisfaction with the indeterminate sentencing model.").

What is often ignored in rigidly applying current Guidelines, is another of the statute's aims—reducing prison overcrowding. *See* Katherine Oberlies, *"Tragic Choices" and Scarce Prison Resources*, 5 Fed. Sent. R. 208 (1993) (*"Despite the clear direction in 28 U.S.C. § 994(g) in the Sentencing Reform Act of 1984 . . . the Commission has projected a three or fourfold increase in the Federal prison capacity, at a cost of billions of dollars to already overburdened taxpayers"*) (emphasis added); Edward M. Kennedy, *Prison Overcrowding: The Law's Dilemma, in* 478 *Annals of the American Academy of Political and Social Science* 113, 114 (1985) (federal sentencing reform would "reduce incarceration for certain crimes and would reserve the costly sanction of imprisonment for offenders whose incapacitation is worth the price"); *see also* Mae C. Quinn et al., *The Federal Judicial Role During the War on Drugs, in The Judicial Role in Criminal Proceedings* 269, 280 (Sean Doran et al. eds., 2000) ("Our rate of imprisonment is between five and 15 times higher than that of other industrialized nations").

The Sentencing Reform Act provides sentencing judges with flexibility to consider which of the core sentencing principles—retribution, deterrence, incapacitation, and rehabilitation—are most important in a particular case, and to provide alternatives to incarceration where necessary in carrying out statutory goals. *See* 18 U.S.C. § 3553(a)(3) (instructing judges to consider "the kinds of sentences available" when imposing a sentence); Gerald McFadden, *Departures from the Guideline Range:*

*Have We Missed the Boat, or Has the Ship Sunk?* 29 Am.Crim. L.Rev. 919, 925 (1992) ("The Senate recognized the importance of rehabilitation in formulating conditions of probation and programs in prison, and in determining whether a sanction other than a term of imprisonment is appropriate in a particular case") (citations omitted); Norval Morris & Peter Greenwood, *Responses to: Selective Incapacitation and the Efforts to Improve the Fairness of Existing Sentencing Practices,* Review of Law and Social Change 12:67, 71 (1983–84); Edward M. Kennedy, *Commentary—The Federal Criminal Code Reform Act and New Sentencing Alternatives,* 82 W. Va. L.Rev. 423, 427 (1980) (criticizing the pre-Guidelines system because it is "lacks provisions mandating that the sentencing judge consider all sentencing alternatives that might be imposed in a particular case.").

### 1. Solving prison overcrowding

According sentencing judges the flexibility to consider alternatives to incarceration in appropriate cases, Congress reasoned, would solve prison overcrowding. *See* Dale G. Parent, *What Did the United States Sentencing Commission Miss?* 101 Yale L.J. 1773, 1773 (1992) ("The statute gave the U.S. Sentencing Commission . . . broad authority to structure sanctions, to permit judges to individualize sentences, to be parsimonious in the use of punishment, to use nonprison sentences for nonviolent first offenders, and to avoid overcrowding federal prisons."); Edward M. Kennedy, *Prison Overcrowding: The Law's Dilemma, in* 478 *Annals of The American Academy of Political and Social Science* 113, 114 (1985). Congress geared the Sentencing Reform Act to prevent unnecessary increases in incarceration rates. It gave explicit guidance to the Sentencing Com-

mission to maintain control of the prison population. *See* 28 U.S.C. § 994(g) ("The Commission ... shall take into account the nature and capacity of the penal, correctional, and other facilities and services available ....The sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission."). Discretion to impose alternatives to incarceration was to be an important means of eliminating prison overcrowding under the Act. Senator Edward M. Kennedy, one of the chief sponsors and drafters of the Sentencing Reform Act, declared:

> The act's more rigorous control over who will go to prison and for how long is the centerpiece of the law and the key to dealing with the challenge of prison overcrowding.... These provisions evidence the clear congressional intent that the guidelines should not contribute to prison overcrowding but should help to bring prison populations in line with prison capacities.

Edward M. Kennedy, *Prison Overcrowding: The Law's Dilemma, in* 478 *Annals of The American Academy of Political and Social Science* 113, 120 (1985). Thus, undergirding the federal sentencing reform movement was the notion that prison overcrowding or costly expansion could best be controlled through selective incapacitation and utilization of alternatives to incarceration in appropriate cases.

The Sentencing Commission has utterly failed in its assigned task of avoiding unnecessary incarceration. *See, e.g.,* Michael Tonry, *Sentencing Matters,* ch 3, pt III, *Why the Commission Failed* 83 (1996) ("failed so badly in nearly every respect"); Marc Miller, *Purposes at Sentencing,* 66 S. Cal. L.Rev. 413, 468 (1992) ("The Commission's dominant use of incarceration ...

planted the seed for current and continuing problems with overcrowding in prisons."). While federal prison populations continue to soar at enormous cost to the taxpayer, the crime rate throughout the country continues to fall. *See, e.g.,* John Harwood, *Despite McVeigh Case, Curbs on Executions Are Gaining Support,* Wall St. J., May 22, 2001, at 1 ("[Q]uestions about the wisdom of America's get-tough approach are coming from state officials straining to finance the prison boom, leaders of poor neighborhoods depleted by the incarceration of rising numbers of drug offenders and criminologists concerned about the long-term effect on inmates on harsher jail practices."); Fox Butterfield, *Inmate Rehabilitation Returns as Prison Goal,* N.Y. Times, May 20, 2001, at 1, 36 ("In the 1990's, when the economy was hot and tax revenue high, politicians could ignore these costs .... [b]ut ... voters want more money spent on education"); Michael Vitiello, *Reconsidering Rehabilitation,* 65 Tul. L.Rev. 1011, 1053 (1991) ("faced with the unacceptable cost of creating new prison facilities, we may be ready to consider a wide variety of alternatives ...."); *see also* discussion at Part III.D., *infra.*

2. Rehabilitative alternatives to incarceration

Four considerations, in varying degrees and permutations, have traditionally shaped American sentencing determinations: incapacitation, rehabilitation, deterrence of the defendant and of others, and just deserts for the crime committed. *See, e.g.,* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 41 (1998); Robert P. Mosteller, *The United States Perspective on the Judicial Role in Sentencing, in The Judicial Role in Criminal Proceedings* 247, 254–56 (Sean Doran et al. eds., 2000); 1 Wharton's Criminal Law § 1, at 2–3

(15th ed. 1993) ("The principle theories of punishment are retribution, deterrence, and reformation."); Andrew R. Klein, Alternative Sentencing: A Practitioner's Guide 1 (1988) ("retribution, reparations, deterrence, and incapacitation, in addition to rehabilitation" are traditional sentencing goals); Andrew von Hirsch, *Doing Justice: The Choice of Punishment,* xxviii-xxix (1976) (describing restraint of the criminal, deterrence, rehabilitation, and desert as traditional "aims to be served in deciding how the law should respond to law breakers").

The Sentencing Reform Act preserves these traditional concepts of sentencing. Section 3551(a), entitled "Authorized sentences," provides that every defendant "shall be sentenced ... so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case." Retribution, or just deserts punishment is specifically listed in subparagraph (A). § 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."). Deterrence is listed in subparagraph B. § 3553(a)(2)(B) (the need for the sentence "to afford adequate deterrence to criminal conduct."). Incapacitation is referred to in subparagraph C. § 3553(a)(2)(C) (the need for the sentence "to protect the public from further crimes of the defendant"). Finally, rehabilitation is a required goal pursuant to subparagraph D. § 3553(a)(2)(D) (the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.").

It has sometimes been argued that under the Federal Sentencing Guidelines rehabilitation has a subsidiary role compared to incapacitation, general deterrence and just desert punishment as legitimate rationales for sentencing. *See* Sharon M. Bunzel, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows,* 104 Yale L.J. 933, 951 (1995) ("The legislative history of the Sentencing Reform Act of 1984 ... reveals the abandonment of the rehabilitative model in favor of the just deserts philosophy."); *cf.* Michele Cotton, *Back with a Vengeance: The Resilience of Retribution as an Articulated Purpose of Criminal Punishment,* 37 Am.Crim. L.Rev. 1313, 1313 (2000) (retribution as primary purpose of punishment in Model Penal Code).

The language and legislative history of the Sentencing Reform Act belie this assumption denigrating rehabilitation as a critical consideration in sentencing. In addition to the inclusion of rehabilitation in the statute's articulation of sentencing criteria, the Senate Judiciary Committee provided a comprehensive legislative history emphasizing that the Sentencing Reform Act does not favor one sentencing principle over another. *See* S.Rep. No. 98–225, at 58 (1983) ("In setting out the four purposes of sentencing, the committee has deliberately not shown a preference for one purpose of sentencing over another in the belief that different purposes may play greater or lesser roles in sentencing for different types of offenses committed by different types of defendants."); *see also* Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing,* 3 Fed. Sent. R. 326 (1991).

Congress recognized that the sentencing judge must have the flexibility to emphasize one purpose of sentencing over others based upon the individual circumstances of an offender and an offense. *See* S.Rep. No. 98–225, at 58–59 (1983) ("The intent ... is to recognize the four purposes that sentencing in general is designed to

achieve, and to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case."). If rehabilitation were no longer a legitimate main purpose of sentencing, section 3553(a)(3) of the Sentencing Reform Act would be rendered almost useless, since rehabilitation is the principle undergirding such alternative sentences as effective drug treatment or community service. See S.Rep. No. 98–225, at 58 ("[T]he purpose of rehabilitation is still important in determining whether a sanction other than a term of imprisonment is appropriate in a particular case"); see also David C. Anderson, Sensible Justice, Alternatives to Prison 1–21 (1998) (relationship between rehabilitation and alternatives to incarceration).

The Sentencing Reform Act acknowledges that in appropriate cases, imposing alternatives to incarceration satisfies rehabilitation as well as other sentencing principles. The statute does reflect Congress' dissatisfaction with an outmoded model of rehabilitation, which equated remediation with incarceration. The Act's critique of an older rehabilitative model is premised upon the failure of many American prisons to reform its inmates. See S.Rep. No. 98–225, at 58 (1983) (instructing the Sentencing Commission to "insure that the Guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant") (citations omitted); see also David C. Anderson, Sensible Justice, Alternatives to Prison 4 (1998) ("The discouraging history of prisons stigmatized the whole concept of rehabilitation"). Reformers recognized that incarcerating offenders often converts them into "hardened enem[ies] of society." H.L.A. Hart, Punishment and Responsibility 25–27 (1968); see also, e.g., Fox Butterfield, Inmate Rehabilitation Returns as Prison Goal, N.Y. Times, May 20, 2001, at 1, 36;

Peter T. Elikan, Just 'locking 'em up' is costly folly, Natl. L.J., Apr. 23, 2001, at A16 ("[I]f you release prisoners who are unable to read and write, unaccustomed to working, untreated for their drug and alcohol problems and without money in their pockets, you are writing a prescription for disaster.").

The ineffectiveness of the pre-Guidelines sentencing laws in rehabilitating offenders was compounded by civil and employment disabilities that frustrated the released felon's attempt to integrate himself or herself back into society. See Edward M. Kennedy, Commentary—The Federal Criminal Code Reform Act and New Sentencing Alternatives, 82 W. Va. L.Rev. 423, 427 n. 14 (citing federal statutes and regulations prohibiting convicted felons from becoming future commission merchants, floor brokers, or employees in a federally insured credit union); Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States 307 (2000) (describing the felon disenfranchisement laws that serve to further estrange released offenders from mainstream society).

### D. Prisons Still Tend to Be Overcrowded and Criminogenic

Despite Congress' intent to limit unnecessary expansion of crime-producing prisons, the United States today contains more prisoners per capita than any other industrialized nation. See Allen W. Burton, Prisoners' Suits for Money Damages: An Exception to the Administrative Exhaustion Requirement of the Prison Litigation Reform Act, 69 Fordham L.Rev. 1359, 1359 (2001) ("At year-end 1999, one in every 110 men in the United States was an inmate in either a federal or state prison. From 1990 to 1999, the total prison population of state, federal, and local institutions increased by more than 742,000 inmates, and these inmates are remaining in prison

for longer portions of their sentences due to decreased opportunity for parole."); Carol Steiker, *Addressing Declining Rights in an Era of Declining Crime*, 9 J.L. & Pol'y 215, 221–22 (2001); David Cole, *When it Comes to Crime and Punishment, We Have More in Common with Yemen than with Europe*, S.F. Recorder, Jan. 26, 2000, at 6; *Facts About Prisons and Prisoners*, The Sentencing Project (2000) ("The 1999 United States' rate of incarceration of 690 inmates per 100,000 population is the highest reported rate in the world, now ahead of Russia's rate of 675 per 100,000").

In the mid 1970's, shortly before the decline of the rehabilitative model, the American prison population totaled about 325,000, representing a percentage of Americans that had remained essentially static for 200 years. *See* Peter T. Elikann, *Just 'locking 'em up' is costly folly*, Natl. L.J., Apr. 23, 2001, at A16; *see also* Margaret Werner Cahalan, Historical Corrections Statistics in the United States 1850–1984 (Bureau of Justice Statistics 1986). Within the next quarter century, the number of imprisoned Americans soared six-fold to two million. *See* Peter T. Elikann, *Just 'locking 'em up' is costly folly*, Natl. L.J., Apr. 23, 2001, at A16. Significantly, the recent increase in the rate of incarceration does not reflect increasing crime rates. To the contrary, "[t]he number of serious crimes in the United States remained steady last year after an eight-year decline, the longest on record." Fox Butterfield, *U.S. Crime Figures Were Stable in '00 After 8–Year Drop*, N.Y. Times, May 31, 2001, at 1; *see also* Carol Steiker, *Addressing Declining Rights in an Era of Declining Crime*, 9 J.L. & Pol'y 215, 221 (2001); Tracy Maclin, *id.*, at 223 ("If current trends continue, by the year 2010 ... a majority of black males will be ... in prison, parole or punishment.").

In contravention of Congressional design in passing the Sentencing Reform Act, the federal prison population in particular has mushroomed, rising by 9.3% in one year alone—1999—as compared to 1.5% in the states, largely due to the impact of the increased federal role in drug sentencing combined with mandatory sentencing penalties and high rigid Guidelines. *See id.; see also* Gary Fields, *Bush Seeks $4.66 Billion to Cope with Federal Prison Population*, Wall St. J., Apr. 17, 2001, at A22 ("The federal prison population will soon soar nearly a third, even as state prisons level off ... the biggest factor is the rising number of federal prisoners incarcerated on drug charges, many of them serving long, mandatory sentences"); *cf. Record Number Held in Prison; State Rise Slows*, N.Y. Times, Mar. 26, 2001, at A12 ("The number of people in state prisons increased last year at the slowest rate since 1971, though the number incarcerated in the United States remains a record high"). The current and projected federal prison census is incredibly costly. *See* Gary Fields, *Bush Seeks $4.66 Billion to Cope with Federal Prison Population*, Wall St. J., Apr. 17, 2001, at A22 (Bush administration is asking Congress for $4.66 billion next year for the federal Bureau of Prisons, even though "[t]he prison bureau's account is now the largest item—18.9%—in the Justice Department's budget, nearly surpassing the combined budgets of the Drug Enforcement Administration and the Federal Bureau of Investigation."); *see also* Oral Report, Research & Development Coordinator, U.S. Probation Department for the Eastern District of New York (May 9, 2001) (cost of incarcerating each federal offender is $59.02 per day, or $21,542.31 per year plus capital costs for construction).

Much as the framers of the Sentencing Reform Act feared, overcrowding in feder-

al prisons (despite their relatively high quality) makes debilitation much more likely than rehabilitation. Conditions in modern American prisons are "often undisciplined, dangerous, and degrading" because funds are funneled into handling the growing population of offenders rather than improving prison. Charles Fried, *Reflections on Crime and Punishment*, 30 Suffolk U.L.Rev. 681, 692 (1997). Whether by introducing petty criminals to more violent offenders, forcing prisoners into racist gangs, or subjecting them to violence and rape, too often the system serves to exacerbate the criminal tendencies of its inhabitants. *See, e.g.*, James Gilligan, *Violence: Our Deadly Epidemic and its Causes* 168–69 (1996); Daniel Lockwood, *Prison Sexual Violence* 87–101 (1980); David M. Siegal, Note, *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter*, 44 Stan. L.Rev. 1541, 1544–47 (1992).

The rehabilitative programs that exist in prison are often unavailable to the very offenders they would most likely assist—young, nonviolent defendants serving relatively short terms of incarceration. *See* Mae C. Quinn et al., *Some Reflections on the Federal Judicial Role During the War on Drugs, in The Judicial Role in Criminal Proceedings* 269, 280–81 (Sean Doran et al. eds., 2000) ("[T]he American correctional system is unable to adequately meet the needs of those who are imprisoned. Many inmates who could benefit from counseling or drug treatment programs do not receive such services. Others have to wait months or years to receive them. Slots in education and job-training programs are also limited."). Federal inmates are ineligible for residential drug abuse programs if they are sentenced to fewer than twenty-four months in prison, and those inmates who are eligible for the treatment will probably not participate in them before they are released because of

long waiting lists. *See* Federal Bureau of Prisons Drug Abuse Programs Manual § 5.4.1 (2001). Moreover, our prisons are often filled with inmates suffering from AIDS, tuberculosis and other communicable disease. *See, e.g., AIDS in Prisons*, N.Y. Times, May 21, 2001, at A16 ("Tens of thousands of prisoners around the country are infected with the virus that causes AIDS, making prisons one of the most potentially dangerous incubators of the epidemic."); Richard D. Vetstein, *Rape and AIDS in Prison: On a Collision Course to a New Death Penalty*, 30 Suffolk U.L.Rev. 863 (1996).

**E. The Eastern District's Program Stressing Rehabilitation Before Sentence is Appropriate under the Guidelines**

■ The court has the power to defer sentencing, postponing its determination of whether to depart, to allow the defendant further time for rehabilitation. This district's S.O.R.S. program provides a viable sentencing option under the Guidelines for young, nonviolent, first-time offenders who are not accepted for the prosecutorial diversion program and narrowly circumscribed existing sentencing options. It facilitates meeting key objectives of the Sentencing Reform Act. Specifically, S.O.R.S. provides a safe and highly structured alternative to incarceration that will reduce unnecessary prison overcrowding and the risks of recidivism.

■ In determining whether an alternative to incarceration is appropriate, courts have examined several general issues, including the risk a particular sentence poses to the public, the harm caused by the crime, the defendant's prior criminal behavior, his or her likelihood of committing another crime and potential hardship to others. *Cf.* Model Penal Code § 7.01;

Herbert Wechsler & Jerome Michael, *A Rationale on the Law of Homicide II,* 37 Colum. L.Rev. 1261, 1300–24 (1937) (discussing factors such as the risk of defendant's actions, the defendant's character, and cause of behavior in determining severity of punishment).

### 1. Existing sentencing options under the Guidelines

The difficulty and cost of rehabilitating in prison requires the courts to consider the possibility of a non-custodial sentence. *Cf.* ABA Standards for Criminal Justice Sentencing, Standard 18–6.4(a)(3d ed. 1994) ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary."); *id.* Standard 18–6.2(a) ("A sentencing court should consider all permitted types of sanctions . . . ."). Prosecutorial pretrial diversion and existing sentencing options under the Guidelines are unavailable to a wide swath of young, non-violent, first-time offenders who could best benefit from rehabilitative alternatives to incarceration. Although S.O.R.S. is not explicitly recognized by the Guidelines, the court's historic discretion to defer sentencing together with the objectives of federal sentencing reforms render S.O.R.S. a viable alternative to incarceration in appropriate cases.

The Guidelines accord district judges maneuvering room in sentencing, including the discretion to apply one or more of the traditional sentencing principles in a particular case and to consider a variety of sentencing options. *See* Parts II.A.1, II.A.2, *supra.* While on the one hand the Guidelines "reject[ ] imprisonment as a means of promoting rehabilitation, 28 U.S.C. § .994(k)," on the other hand they state "that punishment should serve . . . *educational* . . . goals, 18 U.S.C. § 3553(a)(2)." *Mistretta v. United States,*

488 U.S. 361, 367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (emphasis added).

It has been suggested that the Guidelines themselves are only one factor to be considered with the others, including rehabilitation, set out in section 3553(a). *United States v. Abbadessa,* 848 F.Supp. 369 (E.D.N.Y.1994), *rev'd,* 45 F.3d 713 (2d Cir. 1995); *United States v. Concepcion,* 795 F.Supp. 1262 (E.D.N.Y.1992), *disapproved of,* 45 F.3d 713 (2d Cir.1995); *see also* S.Rep. No. 98–225, at 51–52 (1984) (Sentencing Reform Act will merely "guide the judge in making his decision on the appropriate sentence"); *cf.* Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines,* 28 Wake Forest L.Rev. 223, 242 (1993) (prior versions of Sentencing Reform Act emphasize that "the court would not be bound by the guidelines . . . . [The guidelines] would require only that the sentencing judge 'consider' the sentencing range applicable to the case under the guidelines") (*citing* Edward M. Kennedy, *Toward a New System of Criminal Sentencing: Law with Order,* 16 Am.Crim. L.Rev. 353, 374 (1979)). Even when this view is rejected, so that the Guidelines govern, sentencing courts must, under the statute, consider how rehabilitation can best be accomplished. *See* Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing,* 3 Fed. Sent. R. 326 (1991) ("[B]y ignoring the Congressional mandate to consider purposes, the Commission has failed to consider variables very relevant to the individually tailored sentence. In the absence of more explicit language from the Commission detailing the consideration given criminal justice purposes, courts would appear to be free to cite the abdication of Commission responsibility in this area."); *see also* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of*

*Sentencers,* 101 Yale L.J. 1681, 1708–09 (1992). The current federal sentencing regime supports the utilization of alternatives to incarceration; specifically, pretrial diversion by federal prosecutors and sentencing alternatives to incarceration by judges, which include probation, home confinement, electric monitoring and the S.O.R.S. program.

### a. Pretrial diversion by federal prosecutors

The law accords federal prosecutors the discretion not to prosecute, granting them power to impose conditions under which prosecution can be revived. *See* 18 U.S.C. § 3154(10) (information pertaining to pretrial diversion); United States Attorneys' Manual, Pretrial Diversion Program, § 9–22.010 (2000) ("Pretrial diversion is an alternative to prosecution which seeks to divert certain offenders from traditional criminal justice processing into a program of supervision and services administered by the U.S. Probation Service .... Participants who successfully complete the program will not be charged or, if charged, will have the charges against them dismissed; unsuccessful participants are returned for prosecution."); Joel Cohen & Jonathan Liebman, *Pretrial Diversion: An Alternative to Full Federal Prosecution?* N.Y.L.J., Apr. 6, 1994, at 1 (explaining prosecutorial diversion on the federal level).

The conditions for prosecutorial pretrial diversion, which were developed in the 1930's and are sometimes referred to as the "Brooklyn Plan," generally entail the defendant's rehabilitating him- or herself and maintaining a crime-free record for a substantial period of time. *See United States v. Flowers,* 983 F.Supp. 159, 162 (E.D.N.Y.1997); Joel Cohen & Jonathan Liebman, *Pretrial Diversion: An Alternative to Full Federal Prosecution?* N.Y.L.J., Apr. 6, 1994, at 1 ("[D]iversion or deferred prosecution alternative is not for the innocent defendant but rather for the guilty defendant who can show contrition or extenuating circumstances such as financial, medical or family problems"); Stephen J. Rackmill, *Printzlien's Legacy, The "Brooklyn Plan," a.k.a. Deferred Prosecution,* 60 Fed. Prob. 8 (1996). *But cf.* William J. Powell & Michael T. Cimino, *Prosecutorial Discretion Under the Federal Sentencing Guidelines: Is the Fox Guarding the Henhouse?,* 97 W. Va. L.Rev. 373 (1995) (broad discretion not to prosecute or to provide basis for sentence).

Eligibility for federal pretrial diversion on the initiative of the prosecutor is severely limited, and often inapplicable to drug offenders, even if they are young, nonviolent, and clearly capable of rehabilitation. United States Attorneys' Manual, Pretrial Diversion Program, § 9–22.100 (2000). Non-addicts charged with violating federal narcotics statutes are theoretically eligible for prosecutorial pretrial diversion with the approval of the Criminal Division of the Department of Justice. DOJ Manual § 9–22.100; Joel Cohen & Jonathan Liebman, "Pretrial Diversion: An Alternative to Full Federal Prosecution?" N.Y.L.J., Apr. 6, 1994, at 1. In practice the number of prosecutorial diversions in cases of first-time, "low-level" violations involving federal narcotics statutes is negligible. In the Eastern District of New York, for example, only three drug cases were diverted out of a total of 56 prosecutorial diversions over a seventh month period from October 1, 2000, to May 1, 2001. *See* United States Pretrial Services, Eastern District of New York, Diversion Statistics from Oct. 1, 2000 to Present (May 3, 2001) (during this seven month period 727 criminal cases were commenced in the Eastern District of New York).

Limits on executive pretrial diversion do not apply to judicially controlled pretrial diversions through deferred sentencing. Prosecutorial diversion has an advantage over judicial diversion, however, since the former will leave the defendant without a record of criminal conviction.

### b. Sentencing alternatives to incarceration by judges

Probation remains the most common sentencing alternative to incarceration. *See* U.S.S.G. § 7A2 ("[T]he Sentencing Reform Act recognized probation as a sentence in itself."). House arrest and electronic monitoring are often imposed in lieu of incarceration for offenders who are not selected for pretrial prosecutorial diversion, but who nevertheless appear at sentencing capable of rehabilitation. *See* U.S.S.G. § 5F1.2; *see also* Steven J. Rackmill, *An Analysis of Home Confinement as a Sanction, in Criminal Justice: Concepts and Issues* 229, 229–39 (Chris W. Eskridge, ed., 2d ed.1997) (discussing use of home confinement and electronic monitoring); Paul J. Hofer & Barbara S. Meierhoefer, *Home Confinement: An Evolving Sanction in the Federal Criminal Justice System* (Federal Judicial Center ed., 1987) (home confinement as an alternative to traditional imprisonment). Terms of community service are also increasingly being imposed by sentencing judges. *See* U.S.S.G. § 5F1.3; *see also* Malcolm M. Feeley, Richard Berk, & Alec Campbell, *Between Two Extremes: An Examination of the Effectiveness of Community Service Orders and Their Implications for the United States Sentencing Guidelines,* 66 S. Cal. L.Rev. 155 (1992).

Often the Guidelines' rigid cubbyhole and zones structure prevents adequate consideration of alternative sentencing options for young, nonviolent drug offenders. *See, e.g.,* U.S.S.G. §§ 5B1.1(a)(1)-(2), 5C1.1(c)(3), .1(d)(2) (zone limits on probation and "split" sentences); Note, *Winning the War on Drugs: A Second Chance for Nonviolent Drug Offenders,* 113 Harv. L.Rev. 1485, 1485 (2000) (noting that out of the four-fold increase in the prison population since 1980, over half of the felony convictions involve young, nonviolent drug offenders); Karen R. Smith, *United States v. Johnson: The Second Circuit Overcomes the Sentencing Guidelines' Myopic View of 'Not Ordinarily Relevant' Family Responsibilities of the Criminal Offender,* 59 Brook. L.Rev. 573, 627 (1993).

### 2. S.O.R.S. program

The costs and difficulty of rehabilitation in prison requires the court in a case where the defendant is not selected for prosecutorial pretrial diversion and is ineligible for probation under the Guidelines to consider alternatives to achieve a non-custodial sentence. Significantly, the slower increase in state prison populations has been linked to a growing trend in the state criminal justice system favoring alternatives to prison for young, nonviolent drug offenders. *See Record Number Held in Prison; State Rise Slows,* N.Y. Times, Mar. 26, 2001, at A12 ("Many states are now realizing that it makes not only good criminal justice sense but good financial sense to find alternatives [to incarceration] such as sending drug offenders into treatment programs") (internal quotations omitted). For example, the New York state legislature enacted laws requiring the development of a specific planning process, culminating with a state approved plan allowing local jurisdictions to receive enhanced funding to expand community corrections programming. *See* 1997 New York State *Alternatives to Incarceration* Ann. Rep. 1. The purpose of these laws, which have been expanded in subsequent years, was to reduce unnecessary incarceration in the county jails and state prisons

by assisting courts, public officers and others in avoiding the inappropriate use of prison sentences. *Id.*

The rationale turning federal sentencing reform over to the Sentencing Commission was that an administrative body could remain flexible and nonpartisan in adapting to criminal trends and demographic and penological developments. U.S. Sentencing Guidelines Manual Ch.1 Pt. A (2000) ("The Commission emphasizes ... that it views the guideline-writing process as evolutionary."). The Sentencing Commission's inability to adapt to the problem of overcrowded prisons filled with first-time offenders of drug laws, despite their amenability to rehabilitation and improvement outside of prison, represents an institutional failure. *See* Mae C. Quinn et al, *Some Reflections on the Federal Judicial Role During the War on Drugs, in The Judicial Role in Criminal Proceedings* 277–78 (Sean Doran et al. eds., 2000). In contrast to the Federal Sentencing Guidelines, many states have successfully promoted public safety while avoiding prison overcrowding by adopting a more flexible approach to sentencing under guidelines reforms. *See* Richard S. Frase, *Sentencing Guidelines in Minnesota, Other States, and the Federal Courts: A Twenty–Year Retrospective,* 12 Fed. S.R. 69 (1999) (states are "[g]iving strong priority to the use of state prison for violent and repeat offenders, while emphasizing jail and other community-based sanctions for less serious cases"); *see also* Joseph A. Colquitt, "Ad Hoc Plea Bargaining," 75 Tul. L.Rev. 695, 776 (2001) ("Generally, the state schemes are less rigid.").

In sum, the court's power to defer sentencing together with the Sentencing Reform Act's objective of curtailing prison overcrowding render S.O.R.S. an effective and appropriate alternative to incarceration in appropriate cases. Given the success of these post-arrest, pre-sentencing programs at the state level, postponing sentencing on the federal level to permit offenders to participate in the S.O.R.S. program as a prelude to a downward departure for rehabilitation is an appropriate means of achieving the objectives of the Sentencing Reform Act.

## F. Departing Downwardly from the Guidelines

### 1. Discretion of the sentencing court

Although the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3553 *et seq.,* 28 U.S.C. §§ 991–998, made far-reaching changes in federal sentencing, the Act retained a great deal of the district court's historic discretion. Both the Guidelines and the Sentencing Reform Act allow the "sentencing court [to] impose a sentence outside the range established by the guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " Guidelines § 5K2.0 Policy Statement (*quoting* 18 U.S.C. § 3553(b) (1988)).

The Supreme Court has confirmed that the Act leaves district judges with power to adopt "sentencing procedures that take into account individual circumstances." *Koon v. United States,* 518 U.S. 81, 91, 116 S.Ct. 2035, 2043, 135 L.Ed.2d 392 (1996); *United States v. Bryson,* 163 F.3d 742, 746 (2d Cir.1998) ("The Guidelines do not enumerate all of the factors that may individually or collectively render a case 'atypical.' In fact, *any* aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines may satisfy the atypicality requirement."); *United States v. Cotto,* 793

F.Supp. 64, 66 (E.D.N.Y.1992) ("District courts have substantial discretion in deciding whether to depart from the Guideline range."); *see also Buford v. United States,* 532 U.S. 59, 121 S.Ct. 1276, 1277, 149 L.Ed.2d 197 (2001) (abuse of discretion standard applies where appellate court is reviewing the district court's application of a Sentencing Guidelines term to undisputed facts regarding consolidation of the offender's prior convictions; "the district court is in a better position than the appellate court to decide whether a particular set of individual circumstances demonstrates functional consolidation ... because a district judge sees many more consolidations than does an appellate judge.... As a trial judge, a district judge is likely to be more familiar with trial and sentencing practices in general") (internal quotations omitted); Douglas A. Berman, *Balanced and Purposeful Departures: Fixing a Jurisprudence that Undermines the Federal Sentencing Guidelines,* 76 Notre Dame L.Rev. 21, 105 n. 311 (2000) (reliance on trial courts to develop jurisprudence of departures).

That sentencing courts retain substantial flexibility under the Guidelines is further confirmed by the Supreme Court's decision in *Koon* to apply an abuse of discretion standard in appeals from departures. *See Koon,* 518 U.S. 81, 91, 116 S.Ct. 2035, 2043, 135 L.Ed.2d 392 (1996); *see also* Barry L. Johnson, *Discretion and the Rule of Law in Federal Guidelines Sentencing: Developing Departure Jurisprudence in the Wake of Koon v. United States,* 58 Ohio St. L.J. 1697, 1698 (1998); Francesca D. Bowman, *Has Koon Undermined the Guidelines?* 9 Fed. Sent. R. 32, 32 (1996); Susan E. Ellingstad, Note, *The Sentencing Guidelines: Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities,* 76 Minn. L.Rev. 957, 978 (1992) ("Consistent with the whole act rule, courts should

attempt to ascertain from the Sentencing Reform Act and its legislative history a general congressional intent and give that intent effect. Thus, because the statutory language leans toward the retention of flexibility in sentencing, the courts should exercise that flexibility and impose individualized sentences....").

2. Grounds

a. Probabilities of rehabilitation

Power to depart may be based upon significant pre-sentence rehabilitation—via drug-treatment, incarceration, assumption of familial, work, or education responsibilities, or otherwise—and the probability of continuing steps toward permanent good behavior. *See, e.g., United States v. Core,* 125 F.3d 74, 74–75 (2d Cir.1997), *superceded by rule on other grounds as stated in,* 243 F.3d 685 (2d Cir.2001); *United States v. Williams,* 65 F.3d 301, 306 (2d Cir.1995) (affirming facilitation of rehabilitation as basis for downward departure); *United States v. Blake,* 89 F.Supp.2d 328, 339 (E.D.N.Y.2000). As has been pointed out in connection with defendants who are recovering from drug dependence, "[d]ownward departure for post-arrest rehabilitation complements the notion of just retribution, because the rehabilitated offender ... has both asserted responsibility for her actions and taken positive steps toward reintegration into productive society." Patricia H. Brown, *Considering Post–Arrest Rehabilitation of Addicted Offenders Under the Federal Sentencing Guidelines,* 10 Yale L. & Pol'y Rev. 520, 541 (1992). Under the appropriate circumstances, adequate steps should be taken to allow a defendant facing sentence an opportunity to rehabilitate. Such steps may include, in appropriate circumstances and with adequate controls, granting a request for deferred sentencing similar to the sort of adjournment granted under

prosecutorial diversion programs so that defendants may restore themselves, on their own, to their great potential. Black's Law Dictionary 1287 (6th ed.1990) ("rehabilitation" includes "[r]estoration of an individual to his greatest potential, whether physically, mentally, socially, or vocationally").

■ This circuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation. *United States v. Maier*, 975 F.2d 944, 948 (2d Cir.1992); *United States v. Blake*, 89 F.Supp.2d 328, 345 (E.D.N.Y.2000). In determining whether a defendant is sufficiently rehabilitated to warrant downward departure, sentencing courts in this circuit have delayed sentencing for substantial periods to ensure that the offender can maintain a stable, law-abiding record. The appropriateness of this practice is discussed in detail in *United States v. Flowers*, 983 F.Supp. 159 (E.D.N.Y.1997). As *Flowers* made clear, adjournment of sentencing to enable defendants to rehabilitate or to prove rehabilitation is consistent with the Guidelines and Federal Rules of Criminal Procedure 32 and 35. *See id.; see also* Mae C. Quinn et al., *The Federal Judicial Role During the War on Drugs, in The Judicial Role in Criminal Proceedings* 269, 286 (Sean Doran et al. eds., 2000) ("[A] fair reading of the relevant legal authorities may give the court discretion to depart from the Guidelines in order to give changed circumstances a chance."); Note, *Adjudicative Justice in a Diverse Mass Society,* 8 J.L. & Pol'y 385 (2000).

In *Maier*, the defendant's sentencing was delayed for fifteen months to allow her to participate in drug treatment programs.

*Maier*, 975 F.2d at 945. Even though "her efforts towards rehabilitation followed an uneven course," and she relapsed several times, *id.* at 945, the trial court departed from a 51–63 month applicable sentencing range and sentenced the defendant to a 48 month period of probation based upon her voluntary drug treatment and rehabilitative efforts. *Id.* at 945–46. The Court of Appeals held that this significant downward departure was appropriate because the guidelines had not explicitly precluded rehabilitation as a basis for departure and because the trial judge had properly "examined all of the pertinent circumstances, including the nature of the defendant's addiction, the characteristics of the program she has entered, the progress she is making, the objective indications of her determination to rehabilitate herself, and her therapist's assessment of her progress toward rehabilitation and the interrupting of that progress." *Id.* at 948–49; *see also* Savalle C. Sims, *Should Post–Arrest Drug Rehabilitation Be a Consideration in Granting a Downward Departure Under the United States Sentencing Guidelines?* 20 Legis. 274 (1994). *But see, e.g., United States v. Herman*, 172 F.3d 205 (2d Cir. 1999) (vacating and remanding sentence where the district court departed downwardly from the applicable Sentencing Guideline range only on the basis of a vague record of the defendant's drug rehabilitation); *United States v. Bryson*, 163 F.3d 742, 748 (2d Cir.1998) (vacating and remanding in part sentence where district court downwardly departed based on rehabilitation if the district judge merely "voiced its dissatisfaction with the Guideline range and only vaguely stated its findings regarding Bryson's alleged rehabilitation.").

Downward departures based on post-arrest, pre-sentence rehabilitation have not been narrowly limited to cases of defen-

dants overcoming their drug addiction. *See United States v. Workman,* 80 F.3d 688, 701–02 (2d Cir.1996). In *Workman,* the defendant was part of a narcotics ring operating in Buffalo, New York known as the "L.A. Boys." *Id.* at 691. The enterprise continued from the late 1980's until July of 1992. *Id.* at 692. The defendant had, however, left the group in 1990, served a period of incarceration on another offense and entered the United States Army upon his release. *Id.* at 701. He was arrested for his activity in the "L.A. Boys" sometime thereafter. *Id.* In affirming the district judge's decision to depart downward based on the defendant's rehabilitative efforts, the court of appeals for the Second Circuit noted, "[Defendant's] apparently complete pre-arrest rehabilitation, although not on all fours with *Maier,* falls within its ambit. The trial judge was fully within his authority in granting [defendant] a downward departure for rehabilitation." *United States v. Workman,* 80 F.3d at 701–02 (italics omitted).

In *United States v. Blake,* 89 F.Supp.2d 328 (E.D.N.Y.2000), the district judge departed downward significantly from a rigid guideline of 87–108 months incarceration to a few days of imprisonment plus five years of strictly supervised release in part based on the defendant's extraordinary record of post-arrest rehabilitation. *Id* at 353. During the summer of 1998, the defendant in *Blake,* who suffered from a history of abusive relationships and mental instability, attempted to rob a bank, permanently injuring a teller's hand in the process. *Id.* at 330. Although the defendant showed substantial progress toward rehabilitation and objective indications of her desire to rehabilitate herself at her first sentencing hearing in the fall of 1999, *id.* at 335, the court decided to defer sentencing for another six months "to permit a possible demonstration of further rehabilitation and contrition." *Id.* at 336. At the defendant's second sentencing hearing in the spring of 2000, the court decided that because her rehabilitative record was stable; she continued to make progress with her education, employment, and therapy; and incarceration would likely disrupt the rehabilitative process, a sentence of probation was appropriate. *Id.* at 344 ("[I]ncarceration seems ill suited to facilitate rehabilitation of someone like her. Instead of being surrounded by her loving family and church, she would be placed in an atmosphere fetid with crime. Rehabilitation outside of incarceration is increasingly the only practicable way of dealing with individuals who are still ethically malleable.").

b. Physical and emotional vulnerability

■ A defendant's physical and emotional fragility, which makes him or her far more likely than the typical offender to suffer sexual violence in prison, may also be considered in determining whether deferment of sentencing with an eye toward crafting alternatives to incarceration is appropriate. *See* Kevin N. Wright, *The Violent and Victimized in Male Prison,* 16 J. of Offender Rehabilitation 1, 6, 22 (1991) (sociological studies show that victims of physical, and in particular, sexual assault, in male prisons "tend to be [ ]small, young, and middle class … lack mental toughness and are not 'street-wise' … appear to be less involved in a criminal culture before incarceration and to have less institutional experience"); Peter L. Nacci & Thomas R. Kane, *Inmate Sexual Aggression: Some Evolving Propositions, Empirical Findings, and Mitigating Counter–Forces* 9 (1984) (studies of rape in federal prisons reveal that "the target is singled out by assailants quickly as one who (1) is generally weak and exploitable and (2) 'appropriately' feminine. This volatile combination of circumstances, coupled with the fact that the environment is geographically restricted and avoidance is difficult makes the case of sex pressuring

mortally dangerous."); *see also, e.g., AIDS in Prisons*, N.Y. Times, May 21, 2001, at A16 ("Forcible sex" is "widespread" in prisons, and "[t]he AIDS rate is seven times higher in state and federal prisons than in the population as a whole"); Charles Fried, *Reflections on Crime and Punishment*, 30 Suffolk U.L.Rev. 681, 682 (1997) ("I am concerned by the failure of some American prison systems to assure the physical safety of its inmates and by the widespread regime of intimidation by stronger, organized inmates against the weaker or less experienced inmates."); David M. Siegal, Note, *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter*, 44 Stan. L.Rev. 1541, 1545 (1992) ("Rape in prison occurs brutally and inevitably ... [o]ften, the younger, smaller, or less streetwise inmates are the victims."); Martin L. Haines, "Prison Rape Highlights the Need for Better Prison Administration," 154 N.J.L.J., Dec. 14, 1998, at 23 ("Estimates of the number of rapes occurring in prisons, countrywide, run as high as 7,000 per day, a figure said to be conservative .... Gang rape is common.").

The Supreme Court has acknowledged that extreme vulnerability of criminal defendants is a factor that was not adequately considered by the Commission in formulating the Guidelines and is therefore a proper ground for departure pursuant to section 3553(b) of title 18. *See Koon v. United States*, 518 U.S. 81, 111–12, 116 S.Ct. 2035, 2035, 135 L.Ed.2d 392 (1996) (departure based on "susceptibility to abuse in prison"); Note, *A Trial Judge's First Impression of the Federal Sentencing Guidelines*, 52 Alb. L.Rev. 1, 17 (1988). Accordingly, the Second Circuit has on several occasions approved sentencing courts' decisions to depart downward from the applicable Guidelines range where the district judge has observed that the personal characteristics of the offender make him or her particularly susceptible to abuse in prison. *See, e.g., United States v. Gonzalez*, 945 F.2d 525, 526 (2d Cir.1991) ("[The defendant's] physical appearance, insofar as it departs from traditional notions of an acceptable masculine demeanor, may make him ... susceptible to homophobic attacks"); *United States v. Lara*, 905 F.2d 599, 605 (2d Cir.1990) (downward departure based on defendant's vulnerability to abuse in prison due to the fact that the defendant was a "delicate looking young man with a certain sweetness about him"); *United States v. Blarek II*, 7 F.Supp.2d 192, 211 (E.D.N.Y.1998) ("Because these defendants will be especially vulnerable to abuse in prison given their sexual orientation *as well as their demeanor and build*, downward departure is warranted") (emphasis added); *United States v. Delgado*, 994 F.Supp. 143, 145 (E.D.N.Y. 1998) ("Defendant's diminutive size, and lachrymose and meek demeanor will make her life in prison particularly difficult").

### c. Family circumstances

█ A departure is also allowed based upon extraordinary family circumstances. *See United States v. Galante*, 111 F.3d 1029 (2d Cir.1997); *United States v. Johnson*, 964 F.2d 124 (2d Cir.1992). The Guidelines themselves do not encourage departure based upon family ties and responsibilities. *See* U.S.S.G. § 5H1.10 policy statement. Where, however, the family "factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present," departure is authorized. *Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996).

## IV. Application of Law to Facts

### A. Postponing Sentencing to Permit K to Complete S.O.R.S. Program Comports with the Primary Objectives of Modern Sentencing

█ Incarceration seems ill suited to facilitate rehabilitation of someone like K.

Rather than dealing with his substance abuse problem and learning disability with the support of his Pretrial Services' officer and loving family, K would be placed in an atmosphere dominated by criminals with little chance for individual counseling. Since K has already shown significant rehabilitation under the S.O.R.S. program, the crime-prone environment of prison would likely disrupt this trend.

Rehabilitation outside of the harmful prison environment is increasingly the only practicable way of dealing sensibly with individuals like K, who are still ethically and behaviorally malleable, both because of the difficulty of rehabilitation in prison and the high costs it involves. Moreover, giving K a chance to rehabilitate himself in a real world environment through a highly structured program with sufficient law enforcement controls facilitates other sentencing goals. It promotes deterrence and limits the high cost of incapacitation in prison. A rehabilitated offender no longer poses a threat to the community. Finally, postponing K's sentencing to allow him to establish a record of rehabilitation complies with the essentials of just deserts theory, which demands that a guilty party be punished, but only in accordance with the right to treatment as a human being. *See* A.M. Quinton, *On Punishment, in Philosophical Perspectives on Punishment* 9 (Getrude Ezorsky ed., 1972).

### B. Possible Grounds for Ultimately Departing in K's Case

#### 1. Probabilities of rehabilitation

K's post-arrest participation and progress in the S.O.R.S. program may well place the probabilities of his post-arrest rehabilitation squarely within the parameters of "extraordinary rehabilitation" as defined by *Maier*, 975 F.2d at 948, *Workman*, 80 F.3d at 701–02, and *Blake*, 89 F.Supp.2d at 339–40. The court does not entertain the possibility of downward departure on the ground of extraordinary rehabilitation simply because K is a participant in the S.O.R.S. program; rather, the court endeavors to "conscientiously examine[ ] all of the pertinent circumstances" surrounding the defendant's rehabilitative efforts. *See Maier*, 975 F.2d at 948 ("[Judge Sweet] has not departed simply because the defendant has entered a rehabilitation program. Such programs, easily entered but difficult to sustain, cannot be permitted to become an automatic ground for obtaining a downward departure."). Given the carefully tailored structure of K's rehabilitation program and the expertise of its administrators, successful participation may well constitute a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); *see also* Mary Frances Stuck & Barry Glassner, *The Transition from Drug Use and Crime to Noninvolvement: A Case Study*, 20 Adolescence 669, 669 (1985) ("[R]ehabilitation [is] facilitated by specific structural factors which interact[ ] with and alter[ ] personal values.").

The record contains several objective indications that even at this juncture, the defendant's efforts toward rehabilitation are "extraordinary." Since his arrest, K has abstained from drugs, attended General Equivalency Diploma courses and regular counseling sessions, performed community service, and obtained full-time employment. In all of these areas he has shown marked progress. He has taken steps to treat his drug dependency while attempting to become a contributing member of his family and community. It is likely that if K continues along this path, he will be a peaceful and productive member of society.

Admittedly, the defendant's efforts toward rehabilitation are not without blemish, given the charge of aggravated assault brought against him in December 2000. A perfect record of rehabilitation is not required for the sentencing court to depart from the applicable Guidelines' range. *See Maier*, 975 F.2d at 945 (noting that "[t]he evidence presented to Judge Sweet disclosed that [the defendant's] efforts toward rehabilitation followed an uneven course, not a surprising result for someone with a fourteen-year history of addiction" and affirming the district court's downward departure based on extraordinary rehabilitation). In the instant case, the court may appropriately take the precautionary step of deferring K's sentence for one year to ensure that his overall rehabilitative record is stable before sentencing him based on his already "extraordinary" progress.

### 2. Physical and emotional vulnerability

The court observed at the March 13, 2001 sentencing hearing that K is extremely small-boned and feminine looking. Although he was twenty years old, he had the appearance and demeanor of a teenager. These factors, combined with a psychotherapist's assessment that the defendant's judgment and insight are extremely poor and that he is functioning in the low-average range of intelligence are sufficient to establish that K would be unusually susceptible to abuse in prison, a finding that further confirms the court's decision to defer the defendant's sentencing to ensure that he has been rehabilitated. *See United States v. Flowers*, 983 F.Supp. 159, 172 (E.D.N.Y.1997) (postponing the defendant's sentencing in part because the issue of rehabilitation also had to be considered in light of the defendant's slight physical stature, which might make her a target of abuse in prison).

### 3. Family circumstances

K's family circumstances do not fit the typical pattern that courts in this circuit have relied upon in departing from the Guidelines. The defendant has not supported minor children with inferior or no alternative means of financial and emotional support. *Cf., e.g., Galante*, 111 F.3d 1029, 1034 (2d Cir.1997) (defendant's incarceration would leave his two children in the care of his wife, who speaks little English and does not earn enough money to pay the family's modest rent); *United States v. Blake*, 89 F.Supp.2d 328, 338 (E.D.N.Y.2000) (departing downward in part due to extraordinary family ties because of the emotional trauma the defendant's three year old child would suffer if the defendant, a single mother, were incarcerated). To the contrary, the defendant relied upon his parents' meager income for sustenance and to support his drug habit until April of this year, when he obtained steady, gainful employment for the first time through the S.O.R.S. program. The defendant's family circumstances did become "extraordinary" when his terminally ill mother was fired from her job.

K's family circumstances are sufficiently extraordinary at this juncture to warrant considering a downward departure. "Courts cannot overlook the interrelated impact of sentencing on defendant and ... family. The defendant's removal, through either ... a sentence of imprisonment ... can have a devastating effect on those left behind." *United States v. Guiro*, 887 F.Supp. 66, 70 (E.D.N.Y.1995); *see also* Susan E. Ellingstad, Note, *The Sentencing Guidelines: Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities*, 76 Minn. L.Rev. 957, 984 (1992) ("If the court concludes that a defendant's family circumstances constitute an unusual case, it should then assess the sentencing options. In light of

the societal costs of imprisonment, courts should more frequently implement non-incarcerative alternatives....”). The situation was dire for K's mother, albeit unconnected to the defendant, even before she lost her job, since she and her husband were unable to afford medical insurance. They earned just enough money to cover food and housing expenses for themselves, their two children and an aged parent. If K is incarcerated and unable to continue working, his father's income would be insufficient to meet the family's basic living expenses, much less any of his mother's health care costs. The defendant's younger sister is a freshman at Buffalo State University and cannot be expected to solve the family's financial problems even if she were to drop out of school and seek work. K, by contrast, possesses marketable skills as a mechanic. His new job selling and installing audio equipment for automobiles provides him with a base salary, tips and a possibility for career advancement. Contributing to his mother's health care and his family's general welfare has the added effect of teaching the defendant responsibility for the welfare of others, which will enforce rehabilitative efforts.

## V. *Conclusion*

Both the Sentencing Reform Act and the Guidelines require the sentencing judge to weigh several factors in this case. First, the court must balance the conflicting goals of incapacitation in an environment not conducive to rehabilitation and a chance for rehabilitation while ensuring that the defendant receives just deserts for his wrongdoing. The need to protect the public through deterring first-time offenders like K from adopting a criminal lifestyle is also implicated. Finally, the court must reflect these specific sentencing needs against the broader policy objectives undergirding federal sentencing reform—curtailing unnecessary prison overcrowding through selective incarceration.

Because of K's susceptibility to abuse in prison, extraordinary family circumstances, and ongoing participation in the S.O.R.S. program, a cost-effective rehabilitation program in which he has already demonstrated extensive progress, the court grants a postponement of sentencing for one year to assure itself that the defendant has been rehabilitated and to explore and consider acceptable sentencing options.

For the following year, K must continue participating in the S.O.R.S. program, which includes continuing in the prescribed G.E.D. program, obtaining mental health treatment, and maintaining gainful employment. He is restricted from traveling outside of the New York Metropolitan area. He must continue to abide by a 9:00 p.m. curfew. He must refrain from using or possessing drugs, alcohol and firearms. He must participate in drug testing and treatment as directed by his Pretrial officer. Failure to follow all the terms of his release may result in an immediate and long prison sentence.

SO ORDERED.